CIBRO PETROLEUM PRODUCTS,
INC., Plaintiff,

v.

SOHIO ALASKA PETROLEUM
COMPANY, Defendant.

Nos. 79–CV–446, 79–CV–583.

United States District Court,
N.D. New York.

Feb. 8, 1985.

Collier, Shannon, Rill & Scott, Washington, D.C., DeGraff, Foy, Conway, Holt-Harris & Mealey, Albany, N.Y., for plaintiff; William W. Scott, John B. Williams, Washington, D.C., David F. Kunz, Albany, N.Y., of counsel.

Hesson, Ford, Sherwood & Whalen, Albany, N.Y., for defendant; Daniel Whalen, H. Neal Conolly, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

### I

The present litigation arises out of dealings between the plaintiff, Cibro Petroleum Corporation, Inc. [Cibro],[1] a New York corporation engaged in the business of refining crude oil, and Sohio Alaska Petroleum Company [Sohio],[2] a Delaware corporation which produces, transports and sells crude oil and petroleum products in the United States and abroad. During the relevant damage period involved in this litigation, Sohio was a wholly-owned subsidiary of the Standard Oil Company of Ohio responsible for the marketing of crude oil produced from its Alaska North Slope Crude Oil fields. Cibro Petroleum Products, Inc. is owned by the Cirillo family and is operated with other family-owned petroleum distribution companies.

Jurisdiction is properly predicated in this action upon 28 U.S.C. §§ 1331 and 1332, and under Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973 [EPAA or Act], as amended, 15 U.S.C. § 751 *et seq.*, which incorporates by reference the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note. Venue is conferred pursuant to 28 U.S.C. § 1391(a).

At issue in this litigation is how long defendant Sohio was obligated to supply crude oil to plaintiff Cibro under the terms of their supply agreement. Cibro has pleaded two separate and distinct causes of action. The first cause of action, styled by the parties as the "regulatory cause of action," is based upon the Emergency Petroleum Allocation Act of 1973. Cibro claims that Sohio violated the Mandatory Petroleum Allocation Regulations enacted pursuant to the Act when it ceased supplying crude oil to Cibro in August of 1979. Cibro contends that Sohio was obligated under the existing regulatory scheme to supply crude to Cibro through January 28, 1981, the date controls were lifted on the sale of crude oil under the Mandatory Petroleum Allocation Regulations. Cibro seeks damages in excess of $20.8 million.

Under its regulatory cause of action, Cibro claims that Sohio was compelled as a matter of federal regulatory law to supply crude oil for approximately seventeen months after the date Sohio discontinued supplying crude oil. Cibro maintains that resolution of this cause of action depends upon whether the supply agreement made the subject of this litigation contains a "specific termination date." Cibro contends that, if there is no specific termination date stated in the agreement, a "supplier-purchaser" relationship was created under applicable federal regulations which preempt the contractual provisions in the agreement that waive application of those regulations.

---

1. Plaintiff Cibro is an "independent small refiner" as that term is defined in §§ 3(3) and 3(4) of the EPAA and the regulations issued thereunder. "Independent refiner" is defined as any refiner that obtains more than 70% of its refinery input from sources not subject to its control and which markets a substantial portion of its gasoline through independent marketers. A "small refiner" is defined in § 3(4) as any refiner whose total refinery capacity does not exceed 175,000 barrels per day. The testimony at trial conclusively shows that Cibro is a small refiner as it had a maximum per day output capacity of 30,000 to 40,000 barrels per day. *See* 15 U.S.C. § 752(3) and (4).

2. Effective January 1, 1980, defendant Sohio Natural Resources Corporation changed its name to Sohio Alaska Petroleum Company.

Cibro's second cause of action lies in the realm of contract law. This claim for damages concerns when notice to terminate the supply agreement could effectively have been given. If notice of termination could have been given at any time during the initial term of the contract, then the contract was for a maximum of eleven months expiring on August 31, 1979. If, as Cibro claims, notice of termination could not have been given until the end of the initial eleven month contractual term, the contract was for a minimum of seventeen months, or until February of 1980.

It should be noted that because Cibro's damage claim under the regulatory cause of action is more extensive than under the contract claim, i.e., the contract cause of action seeks damages for six additional months while the regulatory cause of action would extend the contract eight months, if the court concludes that Cibro should prevail under both the regulatory claim and the contract claim, Cibro's contract damages will be subsumed within its regulatory cause of action damages.

One additional collateral issue has been raised by Cibro in this case. Under the contract between the parties, Sohio was entitled to request an increase in the price it charged Cibro for crude oil once every 90 days or in the event of a change in the official selling price of OPEC marker crude oil. Cibro claims that Sohio violated this contractual provision when it increased its price within 90 days of its last increase and not in response to a change in the official OPEC marker price. Cibro claims that the request was based upon a unilateral decision of the Saudi Arabian government to increase production of crude by one million barrels per day which did not constitute an official OPEC marker price change.

A trial to the court was held in this matter from March 21, 1984 through April 2, 1984. After considering the record, the testimony and demeanor of the witnesses, the exhibits, the arguments of the parties and the applicable law, the court now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## II

Commencing in November of 1977 Cibro and Sohio began negotiations for the purchase of crude oil. During this initial period of negotiations Cibro was nearing completion of a refinery in Albany, New York and was seeking a secure long-term source of crude oil from various oil companies. The parties first met in November of 1977 in Houston, Texas at a meeting of the American Petroleum Institute. At that meeting Cibro's representatives expressed a strong interest in obtaining a crude oil supply contract from Sohio, and Sohio's representatives expressed an interest in selling Alaska North Slope Oil [ANS] to Cibro.

Thereafter, on March 28, 1978, David Snively, a representative of Sohio, sent a written essay to Cibro's Enrique Carrero concerning ANS crude oil. During this period ANS was a relatively new crude oil, having first been produced in early 1977 from the Prudhoe Bay field in the State of Alaska. Sohio proposed to sell ANS crude oil to Cibro for a term of "one year, commencing July 1, 1978 and 90 days thereafter unless cancelled by either party giving 90 days notice." This type of supply agreement is commonly referred to in the oil industry as an "evergreen contract," that is, a contract that will continue *ad infinitum* until and unless terminated by either party.

On April 21, 1978, Mr. Snively traveled to New York City with Mr. Christopher Hesketh, a crude oil sales representative of Sohio and met with representatives of Cibro, including Christopher Bohlmann, Chief Negotiator for Cibro and Nicholas Cirillo, Vice-President of Supply and Distribution for Cibro. At the meeting Mr. Cirillo indicated that Sohio's proposed 90-day notice of termination provision was not long enough. The parties discussed a possible one-year contract and a one-year notice of cancellation provision. The meeting concluded with Cibro agreeing to provide Sohio with a

proposal on the term and notice provisions of the contract.

After the April meeting Christopher Hesketh assumed responsibility for direct contact with Cibro and its Chief Negotiator, Christopher Bohlmann. On May 4, 1978 Mr. Bohlmann sent a telex to David Snively containing certain comments and amendments to the draft contract which Sohio had previously given Cibro. Paragraph 7 of the proposed draft provided as follows:

[The contract] shall be for a period of one year commencing with the date of the first delivery (estimated to be Sept. 1–15, 1978) and evergreen thereafter subject to one year(s) prior written notice of cancellation.

See Plaintiff's Exhibit No. 14. Thereafter, on June 2, 1978, Mr. Hesketh responded to Mr. Bohlmann's telex stating that:

Regret we are unable to agree to one year's notice of cancellation after the initial year, but would be willing to increase our proposed 90 days notice to 6 months.

See Plaintiff's Exhibit No. 15.

After several revisions of the contract a final draft was sent to Cibro. The final term clause contained in paragraph 7 of the agreement provides as follows:

The term of this agreement shall be for a period of 11 months commencing on [October 1, 1978] and ending on August 31, 1979 and continuing thereafter unless terminated by either party providing not less than six (6) months notice of termination in writing.[3]

See Plaintiff's Exhibit No. 3.

Sohio commenced deliveries pursuant to its agreement with Cibro in September, 1978. Pursuant to that agreement the first month's supply of crude oil was sent to the General Crude Oil Company of Houston, Texas and Sohio began direct deliveries to Cibro in October, 1978. Thereafter, on January 10, 1979, Christopher Hesketh traveled to New York City and met with Nicholas Cirillo and Enrique Carrero. At that meeting Mr. Hesketh advised Cibro that Sohio was not going to continue the contract beyond August 31, 1979. On January 23, 1979, Mr. Hesketh confirmed his oral notice of termination and advised Cibro that the contract would terminate on August 31, 1979. See Plaintiff's Exhibit No. 4. Thereafter the present litigation ensued.

## III

### A. *Statutory and Regulatory Overview*

■ In response to widespread shortages of petroleum and petroleum products caused by the Arab oil embargo of 1973, Congress enacted the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751, *et seq. See generally, Basin Inc. v. Federal Energy Administration,* 552 F.2d 931 (Temp.Emer.Ct.App.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 821, 54 L.Ed.2d 78 (1977). The Act, which became effective November 27, 1973, was based upon a congressional finding that "a national energy crisis" existed and that "the self-regulatory laws of supply and demand [were] not ... operating in the petroleum market," and, thus, "[i]t [was] imperative that the Federal Government ... accept its responsibility to intervene ... to preserve competition and to assure an equitable distribution of critically short [oil] supplies." Conference Report, H.R.Rep. No. 93–628, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Ad.News, pp. 2582, 2688. The primary aim of the statute was to deal with "existing or imminent shortages [4] and dislocations in the na-

---

**3.** The initial minimum term of the agreement was shortened from 12 to 11 months because of matters relating to the initial start-up of the Albany refinery. Crude oil deliveries actually commenced in October of 1978.

**4.** Congress believed that these shortages would create "severe economic dislocations and hardships which would jeopardize the national flow of commerce and constitute a national energy crisis which [was] a threat to the public health, safety, and welfare ..." of United States oil companies. *See, e.g., Condor Operating Company v. Sawhill,* 514 F.2d 351, 356 (Temp.Emer.Ct. App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

tional distribution system." *Id.* Congress was particularly concerned with protecting "small, independent refiners and marketers from large integrated companies." [5] *See, e.g., Condor Operating Company v. Sawhill,* 514 F.2d 351, 356 (Temp.Emer.Ct. App.), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *Basin Inc., supra,* 552 F.2d at 936.

Upon enactment of the EPAA the President was given 15 days to promulgate regulations providing for the mandatory allocation of crude oil, residual fuel oil and refined petroleum products in amounts and at prices to be specified in the regulations. *See* 15 U.S.C. § 753(a). The Act further contained nine objectives which the regulations were directed to achieve "to the maximum extent practical." Those stated objectives included:

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15 U.S.C. § 753(b)(1).[6]

■ Almost immediately the Federal Energy Office [FEO] responded to Congress' mandate by promulgating the Mandatory Petroleum Allocation Regulations. *See* 10 C.F.R. § 211.63 *et seq.* These regulations essentially provide, with certain exceptions discussed *infra,* that all supplier/purchaser relationships in effect on December 1, 1973 must remain in effect for the duration of the program. Section 211.63 provides in relevant part as follows:

**5.** Congress declared:

The purpose of this Act is to grant to the President of the United States and direct him to exercise specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this Act shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy.

*See* 15 U.S.C. § 751(b).

**6.** To carry out this mandate the President established the Federal Energy Office [FEO]. *See* Executive Order No. 11,748, 38 Fed.Reg. 33,575 (1973). In 1977 this function was transferred to the Department of Energy [DOE] pursuant to the Department of Energy Organization Act, 42 U.S.C. § 7101 *et seq.,* and Executive Order No. 12,009, 42 Fed.Reg. 46,267 (1977).

All supplier/purchaser relationships in effect under contracts for sales, purchases, and exchanges of domestic crude oil on December 1, 1973, shall remain in effect for the duration of this program, except purchases and sales made to comply with this program: *Provided, however,* that (1) any such supplier/purchaser relationship may be terminated by the mutual consent of both parties; (2) the provisions of this paragraph do not apply to the first sale of crude oil pursuant to § 210.32 of this chapter, and (3) the provisions of this paragraph shall not apply to the seller of any new crude petroleum or released crude petroleum, as defined in Part 212, if the present purchaser of such crude petroleum refuses, after notice by the seller, to meet any bona fide offer made by another purchaser....

10 C.F.R. § 211.63(a).[7]

These regulations afford qualified purchasers of domestic crude oil a right to continue to receive supplies of crude oil from their existing contractual suppliers beyond the initially contemplated term of a supply agreement. In effect, § 211.63 "lock[s] or freez[es] into place the supplier-purchaser relationships that existed before the freeze date of December 1, 1973." *Basin, Inc.,* 552 F.2d at 933. Thus, this supplier/purchaser rule stabilized the distribution system and "greatly help[ed] to protect the sources of supply of the small, independent refiners" from victimization on the part of large oil companies in times of shortages. *Id.* at 936; *see also* 41 Fed. Reg. 16,662, 16,663 (April 21, 1976).

 Simply stated, the regulation provides that "[i]f a producer of crude oil had been supplying a certain reseller, or if the reseller had been supplying a certain refin-

er, then the 'freeze' rule required that they continue to do so." *Id.* at 933. In effect the regulation preempts private contracts which are inconsistent with the regulations or which specify a particular termination date while the emergency program is still in effect. *Basin, Inc. v. Federal Energy Administration* 534 F.2d 324 (Temp.Emer. Ct.App.1976). Thus, when the obvious intent of Congress is to give the President broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, the court should not interfere with the perogative of the agency to select the remedy which for rational reasons is deemed most appropriate. *Condor Operating Co. v. Sawhill,* 514 F.2d 351, 359 (Temp.Emer.Ct.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

Once established, a supplier/purchaser relationship can be terminated or waived, notwithstanding § 211.63(b), under the following circumstances:

(d) *Termination of Supplier/Purchaser Relationships.* (1) Any supplier/purchaser relationship established under paragraph (b) [§ 211.63(b)] of this section may be terminated as follows:

(i) At the option of the purchaser, as evidenced by its written consent thereto together with notice of the termination date given to the producer, provided all subsequent purchasers of the crude oil involved have consented to such termination in writing;

10 C.F.R. § 211.63(d)(1)(i).

 The supplier/purchaser relationship set forth in § 211.63 can also be terminated by the supplier unilaterally, pursuant to 10

---

7. 10 C.F.R. § 211.63(b)(1) supersedes § 211.63(a) and provides that "[a]ll supplier/purchaser relationships in effect under contracts for sales, purchases and exchanges of domestic crude oil on January 1, 1976 shall remain in effect for the duration of the program...." 10 C.F.R. § 211.63(b)(2) provides that once any first sale of domestic crude is made which is exempt from this rule pursuant to paragraph (a)(4) of this section a supplier/purchaser relationship between a seller and purchaser shall be

established *thereafter* as though it had been in effect on January 1, 1976. Section 211.63(a)(4) applies to the first sale of any domestic crude oil produced and sold from a property from which domestic crude oil was not produced and sold prior to January 1, 1976. In the present case both parties concede that the Alaska North Slope crude oil sold by Sohio to Cibro falls within this category, and thus 10 C.F.R. § 211.63(b)(2) is the applicable regulation.

C.F.R. § 211.63(d)(iv)(A), where the purchaser is a *reseller*[8] and the constituent components of the regulation are satisfied. Section 211.63(d)(iv) provided at all times relevant to this litigation that a supplier/purchaser relationship could be terminated:

> (iv) By a producer (as defined in Part 212 of this chapter) as to a reseller purchasing crude oil from that producer: *Provided,* that:

> (A) At least thirty days in advance of any termination under this subdivision (iv), the producer shall give to the reseller purchaser from it whose supplier/purchaser relationship is proposed to be terminated a written termination notice stating the date of termination, the source, quality, and estimated volume of crude oil involved (including the portions of that volume that are priced as lower tier crude oil, upper tier crude oil and uncontrolled crude oil under Part 212 of this chapter), and the name and address of the new reseller to which such crude oil is proposed to be sold.

*Id.* However, consistent with the general policy objectives of the EPAA, § 211.63(d)(iv) provides that once a crude oil reseller has been replaced, the new crude oil reseller is obligated to establish a supplier/purchaser relationship with the former reseller's customers. The regulation was designed to permit a supplier to substitute one reseller with another in order to foster greater flexibility in the crude oil distribution system. *See generally, Basin, Inc.,* Interpretation 80–6, 45 Fed.Reg. 25,376 (April 15, 1980).

B. *Application of the Regulations to the Instant Case*

As noted previously, count II of Cibro's amended complaint asserts that the Mandatory Petroleum Allocation Regulations required Sohio to continue selling crude oil to

Cibro and that Sohio breached its obligation when it ceased supplying crude oil on August 31, 1979. In the instant case there is no dispute that Sohio's sales of crude oil to Cibro created a supplier/purchaser relationship within the meaning of § 211.63(b)(2). Rather, the central dispute between the parties concerns whether the supplier/purchaser relationship was validly waived by Cibro and whether Sohio properly terminated the relationship. The dispositive inquiry with respect to whether the relationship was validly terminated and/or waived concerns whether the contract for the sale of crude oil contains a "specific termination date." Cibro claims that if there was no specific termination date expressly stated in the supply agreement, Sohio was obligated to supply crude oil to Cibro until January 28, 1981, the date federal controls on the allocation of crude oil were removed.

There are two sections of the Cibro-Sohio agreement which must be looked to in determining whether the parties' relationship was validly and properly terminated. The first relevant section is the term clause contained in paragraph 7 of the contract. *See* Plaintiff's Exhibit No. 3, ¶ 7. That section provides as follows:

### Terms

The term of this agreement shall be for a period of 11 months commencing on October 1, 1978 and ending on August 31, 1979 and continuing thereafter unless terminated by either party providing not less than six months notice of termination in writing.

The second relevant provision is contained in paragraph 12 of the contract. That section provides an agreement by each party to consent to termination of any supplier/purchaser relationship that might be im-

---

**8.** Sohio has alleged in the fourth affirmative defense of its amended answer to count II of Cibro's amended complaint that Cibro was a reseller within the meaning of 10 C.F.R. § 211.63(d)(iv)(A) and that it "substantially complied" with the regulation in providing Cibro with notice of termination. Cibro claims that it would

have "refined" and not resold crude oil after August 31, 1979 and, thus, the regulation is inapplicable. Additionally, Cibro claims that assuming *arguendo* § 211.63(d)(iv)(A) is applicable, Sohio failed to substantially comply with the regulation.

posed under 10 C.F.R. § 211.63. Paragraph 12 provides as follows:

### Mutual Intention to Terminate

The parties hereby agree that under any "freeze" of Supplier/Purchaser relationships imposed under Department of Energy Regulation 10 CFR Section 211.-63, or any future governmental regulation which has the same effect which requires the consent of either or both parties to the termination of such relationships such consent to termination shall be given by either party at the request of the other should this Agreement terminate or be terminated in accordance with the termination provisions provided herein. In order to implement the foregoing under Federal regulations, Buyer hereby agrees to include a similar provision in any contract of resale of the Oil purchased under this Agreement.

*See* Plaintiff's Exhibit No. 3, ¶ 12.

Cibro contends that paragraph 7 clearly indicates that the parties failed to agree that the contract would terminate on a date certain. Specifically, Cibro claims that the phrase "and continuing *thereafter* unless terminated by either party ..." means that the contract is "evergreen" [9] in nature and, thus, by definition indefinite. Sohio, of course, claims that August 31, 1979 is the effective termination date of the contract, provided that notice of termination was provided at least six months prior to termination. According to Cibro, because the contract could continue after the initial term, i.e., after August 31, 1979, the contract cannot envisage a specific termination date.

Moreover, Cibro maintains that, under numerous binding Department of Energy precedents, such "evergreen" contracts have been held as a matter of federal law to lack specific termination dates. Sohio

contends that the language of the term clause, which provides for a "contingent" extension of the contract, does not negate an express end date of August 31, 1979. Rather, such language is merely precatory or permissive and evinces no more than an understanding between the parties that they might contract again in the future. In other words, Sohio posits that the supply agreement could only continue after August 31, 1979 contingent upon future election, by act or omission of either party, thereby rendering the specified end date a "specific termination date" within the meaning of the supplier/purchaser rule.

Sohio further argues that, assuming *arguendo* the contract lacks a specific termination date, the contract was nonetheless properly terminated because (1) the supplier/purchaser regulation and the relevant DOE interpretations do not require a specific termination date for advance consent to terminate clauses; (2) the provision of the contract which permits the agreement to continue after the initial term constitutes an unenforceable "agreement to agree;" (3) CIBRO validly waived the protections of the supplier/purchaser rule under paragraph 12 of the supply agreement; (4) valid waivers under relevant DOE interpretations do not require a specific termination date; and (5) Cibro's past resale conduct allowed Sohio to validly terminate under an alternate regulatory scheme, viz., 10 C.F.R. § 211.63(d)(iv)(A).

■ In resolving plaintiff's regulatory cause of action, the court must make a threshold determination with respect to the interpretation of paragraph 7 of the parties' supply agreement. Although during trial a substantial number of evidentiary objections were raised under the parol evidence rule relating to the contract cause of action in this case,[10] both parties assert

---

**9.** More specifically, an "evergreen contract" is the customary trade usage term in the petroleum industry for a contract which continues indefinitely until terminated by either party pursuant to a particular notice period specified in the contract.

**10.** Paragraph 15 of the contract between Cibro and Sohio provides that all questions arising under the contract *shall* be governed by the law of the State of Ohio and, to the extent Ohio law does not apply, by the laws of the United States. Both parties concede that Ohio's parol evidence rule is applicable in this case. *See* Section 2–

that the parol evidence rule should be applied in resolving the regulatory cause of action. The court agrees.

In the present case the court concludes that paragraph 7 of the contract may be interpreted solely as a matter of law with respect to whether a "specific termination date" is contained therein.[11] Where, as here, the contract's language admits of only one reasonable interpretation, the court need not look to extrinsic evidence of the parties' intent or to rules of construction to ascertain the contract's meaning. *See American Home Products v. Liberty Mutual Insurance Co.*, 748 F.2d 760 at 765 (2d Cir.1984). The only determination to be made is the significance of the phrase "and continuing thereafter" and whether this language causes the contract to have a specific termination date *vel non*. Cibro's regulatory cause of action is grounded in large part on a number of regulatory interpretations rendered by the DOE (and its predecessor, the Federal Energy Administration) and certain Temporary Emergency Court of Appeals [TECA] decisions which the court finds dispositive of this issue. These Department of Energy interpretations have expressly addressed this question with specific reference to the regulatory provision implicated in count II of Cibro's amended complaint.

In light of these interpretations the court finds that the language of the contract is clear and unambiguous, and, thus, the question of whether the agreement contains a specific termination date will be determined solely by reference to the terms of paragraph 7. Accordingly, the parol evidence rule will operate to bar all extrinsic evidence relating to this issue, including evidence of trade usage and custom in the petroleum industry proffered at trial.[12]

## C. *DOE Interpretations*

■ As a preliminary matter, the court notes that DOE rulings are entitled to substantial deference in this case. As early as 1945, and consistently thereafter, the Supreme Court has announced certain "fundamentals" about judicial interpretation of rules:

> Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. The intention of Congress or the principles of the Constitution in some situations may be relevant in the first instance in choosing between various constructions. But the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

202 of the Uniform Commercial Code, Ohio Rev.Ann. § 1302.05. The court can find no reason for disregarding this forum selection clause. *See Bense v. Interstate Battery System of America, Inc.*, 683 F.2d 718 (2d Cir.1982); *see also* U.C.C. § 1–105.

**11.** This determination is not inconsistent with Judge Foley's decision of June 6, 1980, wherein he reaffirmed his view that a genuine issue of material fact existed as to the meaning of the term clause "and the trade usage incorporated therein." *See Cibro Petroleum Products, Inc. v. Sohio Natural Resources Company*, No. 79–CV–446, slip op. (N.D.N.Y. June 6, 1980) [hereinafter cited as *Cibro Petroleum* ]. Subsequent to Judge Foley's decision, several DOE interpretations have been rendered (and adopted by TECA) which allow this court to make a purely legal determination.

**12.** While both parties have conceded that the parol evidence rule applies to exclude extrinsic

evidence relating to the "regulatory cause of action," there does appear to be a difference of opinion on what constitutes parol evidence and what constitutes the agreement between the parties. Sohio has attempted to introduce into evidence an August 14, 1978 memorandum, authored by Christopher Bohlmann, *see* Defendant's Exhibit C, as a document which constitutes a "confirmatory memorandum." The court agrees with plaintiff that this document is superseded by the final contract entered into by the parties, dated October 1, 1978. *See* Plaintiff's Exhibit No. 3, ¶ 17. Because Plaintiff's Exhibit No. 3 is a final integrated contract, it serves to supersede Defendant's Exhibit C on this limited issue. *See Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987 (S.D.N.Y.1968); *see also, generally, Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106 (6th Cir.1979).

Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *United States v. Larinoff*, 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–2156, 53 L.Ed.2d 48 (1977); *see also* 2 Davis, *Administrative Law Treatise* § 7:22 (2d ed. 1979). Thus, an administrative interpretation is entitled to substantial deference unless plainly erroneous or inconsistent with the regulation.[13] *See United States v. Larinoff*, 431 U.S. 864, 872–873, 97 S.Ct. 2150, 2155–2156, 53 L.Ed.2d 48 (1977); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965).

Moreover, an agency's interpretations are entitled to particular deference when, as here, Congress has provided DOE with expansive discretion in implementing a complex allocation scheme for the petroleum industry:

> [S]uch cases are only episodes in the evolution of adjustment among private interests and in the reconciliation of all these private interests with the underlying public interest in such a vital source of energy for our day as oil. Certainly so far as the federal courts are concerned the evolution of these formulas belongs to the Commission and not to the judiciary. A controversy like this always calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted.... It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better.

Powerline Oil Co. v. Federal Energy Administration, 536 F.2d 378, 385 (Temp. Emer.Ct.App.1976) (quoting *Railroad Com. v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 580–584, 60 S.Ct. 1021, 1024–1025, 84 L.Ed. 1368 (1940).)

▮ As noted previously, and of particular importance for purposes of the present discussion, DOE regulations effectively preempt all private contracts which are inconsistent with those regulations. For purposes of count II of Cibro's amended complaint, 10 C.F.R. § 211.63 has specifically been held to supersede private contractual provisions which conflict with the supplier/purchaser rule. *See Condor Operating Co., supra*, 514 F.2d 351 at 361.[14]

▮ In *Condor*, Condor Operating Company, a crude oil supplier, entered into a contract with Phillips Petroleum Co., a crude oil refiner, to sell certain crude oil to Phillips. Condor challenged in the district court a remedial order issued by the FEA which required it to continue supplying crude oil to Phillips, notwithstanding a contractual provision which provided that Condor had the option to cease supplying crude oil to Phillips provided that proper notice was effected. The district court concluded that FEA's determination that the supplier/purchaser rule superseded the contract was invalid. TECA reversed, holding that the supplier/purchaser relationship created under § 211.63 was a valid rule intended, *inter alia*, to protect small and independent refiners from severe economic dislocations and hardships. TECA determined that the rule should be upheld.

In noting that Congress validly enacted the EPAA with obvious intent to give the

---

**13.** This court has previously noted that the DOE interpretations relied upon by Cibro are entitled to deference. On June 6, 1980 Judge Foley, in denying defendant's motion to dismiss count II of plaintiff's amended complaint, ruled that agency interpretations are entitled to deference unless plainly erroneous or inconsistent with the regulations. Additionally, Judge Foley concluded that the *Arizona Fuels* interpretation, Interpretation 1979–18, 44 Fed.Reg. 60,264 (Oct. 19, 1979), which clarified previous DOE interpretations, was not plainly erroneous or inconsistent with the regulation at issue. *See Cibro Petroleum, supra*, at 6. (court cannot say that

the DOE interpretations of 10 C.F.R. § 211.63 are plainly erroneous or inconsistent with the regulation).

**14.** TECA has further observed that the supplier/purchaser rule may also supersede private contracts which were executed after the effective date of the EPAA. *See Basin, Inc. v. Federal Energy Administration*, 534 F.2d 324, 326 (Temp.Emer.Ct.App.1976) (sales made after the Allocation Act are not beyond the reach of the legislation).

President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes, *id.* at 359, TECA concluded that:

> The effect of invalidating the administrative action here would be far-reaching. The authority of the FEA, or its counterpart under any future stabilization plan, to cope with an energy crisis on the basis of a coordinated and balanced plan could be rendered questionable indeed. Essential powers of government to meet this or other crises in perilous times would be frustrated by the adoption of an excessively rigid and unprecedented construction inhospitable to broad realities. A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change.

*Id.* at 362. Moreover, in summarily rejecting Phillips' fifth amendment challenge, the court observed that:

> A reasoned decision for the temporary suspension of usual ownership prerogatives based upon broad national needs does not constitute necessarily an unconstitutional taking; and the issue of whether it does properly turns upon the circumstances of each case. *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958). The regulation of future action based on rights previously acquired by the person regulated is not per se prohibited by the constitution. *Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947). Reasonable and practical regulations which are generally fair and equitable, although not necessarily so as applied to a particular person, are not unconstitutional when general regulations are necessary to accomplish an appropriate congressional purpose.

*Id.* at 361 (quoting *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944).)

Thus, in the instant case the court may validly apply § 211.63, notwithstanding the fact that the. Cibro-Sohio agreement contains a provision wherein the supplier/pur-chaser rule is specifically waived. However, as will be discussed in further detail *infra,* DOE has established certain rigorous standards for determining whether § 211.63 will apply to contracts which disclaim its applicability. Once a supplier/purchaser relationship is established, the purchaser is entitled to continued access to crude oil from its supplier for the duration of the allocation program unless consent to termination is given in advance, or the requirements of § 211.63 are specifically waived. Because of the strong policy objectives underlying the EPAA, however, both TECA and the DOE have established stringent requirements for determining when, and to what extent, advance consent to terminate or waiver clauses will serve to preempt § 211.63.

Cibro relies principally upon three DOE interpretations which in substance conclude that advance written consent to terminate clauses contained in supply contracts must contain a specific termination date in order to comply with the termination provision contained in 10 C.F.R. § 211.63(d)(1)(i). *See Arizona Fuels Corporation,* Interpretation 1979–18, 44 Fed.Reg. 60,266 (October 19, 1979); *Giant Industries,* Interpretation 1981–2, 46 Fed.Reg. 27,279 (May 18, 1981), *petition for reconsideration denied,* 46 Fed.Reg. 46,299 (September 18, 1981); and *Murphy Oil,* Interpretation, 1981–17M, 47 Fed.Reg. 13,771 (April 1, 1982). Sohio primarily relies upon three interpretations of the FEA, in existence at the time of the parties' agreement, which hold that 10 C.F.R. § 211.63 may be contractually waived by the parties under certain limited circumstances. *See State of Alaska,* Interpretation 1977–7, 42 Fed.Reg. 31,143 (June 20, 1977); *Alaska Petrochemical Company,* Interpretation 1978–1, 43 Fed.Reg. 5797 (Feb. 10, 1978); and *The Permian Corporation,* Interpretation 1978–45, 43 Fed.Reg. 34,436 (August 14, 1978).

The primary issue in the *Arizona Fuels* case was whether the termination clause in the parties' agreement constituted consent to terminate in accordance with 10 C.F.R. § 211.63(d)(1)(i). Arizona Fuels was a

small independent refiner who contracted with Comp-Cal Corporation, resellers of crude oil, to purchase domestic crude oil from Trans World Corporation. The agreement between Arizona Fuels and Comp-Cal included an advance consent to terminate provision whereby the agreement was "to continue unless cancelled by either party giving a minimum of sixty-five (65) days prior written notice to the other party." *Id.* at 60,267. The agreement between Comp-Cal and Trans World contained a similar provision. Trans World provided Comp-Cal with 65 days notice in accordance with the agreement. Thereafter, Comp-Cal notified Arizona Fuels of the termination and provided notice of termination to Arizona Fuels.

Arizona Fuels sought an interpretation from DOE that the advance consent to terminate clause was invalid because it did not comport with § 211.63, and that Trans World, thus, had a continuing obligation to supply Comp-Cal with crude. DOE initially noted that supplier/purchaser relationships were created between Arizona Fuels and Comp-Cal as well as Comp-Cal and Trans World. DOE next concluded that in order to be effective advance consent to terminate clauses must meet all three of the following requirements:

> First, that the consent be in writing; second, that all subsequent purchasers consent; and, third, *that a specific termination date be indicated at the time the purchaser gives his consent.*

*Id.* at 60,267 (emphasis added). Because both parties in *Arizona Fuels* conceded that the termination clause contained in the agreement and relied upon by Trans World did not give notice of a specific termination date, DOE concluded that the termination clause was insufficient on its face to constitute consent to terminate pursuant to § 211.63(d)(1)(i), and, thus, the supplier/purchaser relationship was not validly terminated.

The *Arizona Fuels* interpretation served to clarify several previous DOE and FEA interpretations to the extent that it was now clear that, while consent to termina-

tion of a supplier/purchaser relationship could be given by a purchaser, such consent must meet the specific requirements that the consent be in writing, that all subsequent purchasers consent, and that a specific termination date be indicated at the time the purchaser gives his consent. Moreover, and critical for purposes of the present discussion, for the first time the DOE strongly suggested, *sub silentio*, that a contract containing an "evergreen" clause which specifies an initial term for the contract and permits the contract to remain effective beyond that term unless terminated by either party, does not contain a specific termination date.

The next significant interpretation relevant to this litigation was rendered in 1981. In *Giant Industries*, Interpretation 1981-2, 46 Fed.Reg. 27,279 (May 18, 1981), *petition for reconsideration denied*, 46 Fed.Reg. 46,299 (September 18, 1981), the DOE concluded that a contract clause waiving protections afforded a purchaser under 10 C.F.R. § 211 must contain a specific termination date in order to be effective. Thus, waiver clauses were construed to require the same regulatory treatment as advance consent to terminate clauses analyzed in *Arizona Fuels*.

Giant Industries, Inc., a small independent refiner, had entered into a contract with The Crude Oil Company [TCC], a reseller of crude oil, for the purchase of crude oil. The agreement contained an "evergreen" provision providing that the contract would "continue month to month thereafter unless cancelled by either party giving thirty days notice." The contract also included a waiver provision which contained the following language:

> All of the terms and conditions of this Contract shall be subject to the applicable laws, statutes, directives, orders, rules and regulations (including interpretations thereof) of all governmental authorities having jurisdiction hereof. However, no present or future Federal, State, County or Municipal law, rule, regulation or ordinance shall have the effect of perpetuating the relationship created

hereby beyond the limited scope and term contemplated and agreed upon herein. Thus, it is expressly understood and agreed hereto that, upon termination of this contract, any crude oil supplier/purchaser relationship created hereby pursuant to the Department of Energy's Mandatory Regulatory Administration shall be automatically terminated. If it is deemed necessary, the parties hereto also agree to execute any and all written instruments required to evidence the termination, by mutual relationship created hereby.

*Id.* Pursuant to this provision TCC notified Giant of its intent to terminate Giant's crude oil supply agreement.

Similar to *Arizona Fuels,* the parties agreed that there was no specific termination date provided for in the supply contract. Instead, the supplier, TCC, asserted that the waiver clause served to supplant or displace the supplier/purchaser rule. Relying upon earlier FEA and DOE interpretations,[15] DOE concluded that the termination clause did not constitute consent to terminate the supplier/purchaser relationship in accordance with § 211.63. Significantly, DOE further concluded that "[t]he option to terminate this supply [agreement] ... belongs to the *purchaser alone,* based in part upon the recognition of the pressure that suppliers may apply by conditioning a supply agreement on the purchaser's advance consent to terminate." *Id.* at 27,280 (emphasis added). In wholly rejecting

TCC's contention that a waiver serves as a blanket repudiation of § 211.63(d)(1)(i), DOE stated:

By consenting in advance to a termination of the supplier/purchaser relationship, the purchaser is waiving its rights to continued supplies of crude oil. The vehicle provided by the regulations for effecting such a waiver is the purchaser's option to terminate. By requiring that this option be exercised in strict accordance with § 211.63(d), the DOE protects the purchaser from the unexpected interruption of its crude oil supplies at the discretion of its supplier. A purchaser's advance consent to terminate is a limited waiver of its rights and the only waiver allowed under the rule as it applies to supplier/purchaser relationships entered into before October 1, 1980.

*Id.* at 27,281.

The *Giant Industries* interpretation was subsequently endorsed by TECA in *Johnson Oil Co., Inc. v. Department of Energy,* 690 F.2d 191 (Temp.Emer.Ct.App.1982). *Johnson Oil* also involved a situation in which a purchaser was alleged to have waived its right to a crude oil supplier/purchaser relationship. In concluding that paragraph 8 of the parties' agreement did not effect a valid waiver,[16] TECA specifically adopted the *Giant Industries* interpretation, noting that "[a]dvance consent to terminate [is] recognized by the DOE if it was written, specific as to the rights under § 211.63 and had a specific termination

---

**15.** *See The Permian Corp.,* Interpretation 1978–45, 43 Fed.Reg. 34,436 (August 4, 1978); *Alaska Petrochemical Co.,* Interpretation 1978–1, 43 Fed.Reg. 5,797 (February 10, 1978); and *State of Alaska,* Interpretation 1977–7, 42 Fed.Reg. 33,-143 (June 20, 1977).

**16.** The purported waiver provision provided as follows:

*Paragraph 8.* Sellers have informed purchaser that Mobil Oil Company and Mountain Fuel Supply Company have terminated their supply arrangement with the Company or with the Company's supplier Johnson Oil Company. Purchaser has informed sellers that he intends to obtain his own supply of crude oil or condensate for the operation of the refinery. Purchaser and Sellers hereby agree that all rights, title and interest to any

crude oil that Southwestern Refinery may have be [sic] and the same are hereby transferred to Sellers. Purchaser agrees that Sellers have not represented to Purchaser that Sellers will obtain a supply of crude oil or condensate for the use of the refinery. However, Sellers hereby grant to Purchaser a right of first refusal to purchase crude oil from Sellers in the event that the Sellers are able to obtain crude oil to resale [sic]. Such right of first refusal shall be predicated on Purchaser's agreement to purchase said oil from Sellers at the highest legal price Sellers would be able to obtain for the crude oil from any other source whatsoever. The term 'crude oil' in this Agreement shall mean the same as "condensate."

date." *Id.* at 195. Thus, relying upon *Giant Industries,* the court held that because paragraph 8, relied upon by Johnson Oil was a general waiver which failed to specify any rights under § 211.63, it was invalid.

▮▮▮▮ A distillation of the various holdings of these DOE and TECA decisions may be stated as follows. First, consent to a termination of a supplier/purchaser relationship may be given by the purchaser. Such consent, however, must meet the specific requirements that the consent be in writing, that all subsequent purchasers consent and, most importantly, that a specific termination date be indicated at the time the purchaser gives his consent. Second, a contract clause waiving protections afforded a purchaser under 10 C.F.R. § 211.63 must contain a specific termination date to be effective. Waiver clauses are to be strictly construed and a clause which simply waives the applicability of the supplier/purchaser rule, or which provides consent to terminate upon the request of the other, is invalid absent a specific termination date. Finally, a contract which contains an evergreen clause does not contain a specific termination date and, hence, cannot constitute either advance consent to terminate or a waiver of 10 C.F.R. § 211.-63(d).

In an attempt to distinguish these controlling DOE pronouncements, Sohio has taken the position that both *Arizona Fuels* and *Giant Industries* are of dubious precedential value because the parties in both cases conceded that a specific termination date was lacking in their respective supply contracts. Consequently, Sohio asserts that *Arizona Fuels* and *Giant Industries* can only be read to establish the undifferentiated abstract proposition that a specific termination date is required to terminate pursuant to § 211.63. Specifically, Sohio asserts that the contracts involved in those cases are radically distinguishable from the present contract because the Cibro-Sohio

contract denominates an express "end date." In other words, Sohio contends that it is legally significant that the Cibro-Sohio contract contains an evergreen clause *after* a designated end date.[17] Sohio maintains that the contractual termination language scrutinized in these DOE interpretations sharply contrasts with the language in the crude oil contract between Sohio and Cibro, wherein paragraph 7 designates the end date of the initial term as August 31, 1979. Cibro, however, claims that although a date is mentioned in paragraph 7, it is not a specific termination date. Rather, Cibro claims that it merely sets forth a date prior to which the contract cannot be terminated. Cibro maintains that the primary focus of the DOE in these cases was whether the contracts at issue were evergreen in nature, not whether an initial term was specified. The court agrees with Cibro.

A careful analysis of both these interpretations reveals that the DOE primarily focused upon the strong policy objectives underlying the supplier/purchaser rule in resolving the disputes in those cases, not the precise terms of the contracts at issue. Although DOE concluded out of hand that the contracts lacked a specific termination date, it also concluded that use of advance consent to terminate and/or waiver clauses would thwart the legislative policies behind the supplier/purchaser rule unless the contracts contained a specific termination date. In so ruling the DOE also implicitly concluded, in this court's view, that evergreen provisions do not comport with the legislative objectives of the supplier/purchaser rule. DOE specifically noted that the option to terminate under § 211.63(d)(1)(i) belongs "to purchasers alone," based upon the recognition that suppliers may apply pressure "by conditioning a supply agreement on the purchaser's advance consent to terminate." *Giant Industries,* 46 Fed. Reg. at 27,280.

---

17. For example, whereas the Cibro-Sohio contract provides that "[t]he term ... shall be for ... 11 months commencing on October 1, 1978 and ending on August 31, 1979 and *continuing* thereafter ...," the *Arizona Fuels* contract provided that: "Term: Effective November 21, 1977, and to continue unless cancelled by either party giving a minimum of sixty-five (65) days prior written notice to the other party."

In this court's view, DOE's focus on the "option to terminate" as "belonging to the *purchaser* alone," necessarily presupposes that evergreen provisions cannot have specific termination dates within the meaning of § 211.63. The court's conclusion is based upon the following reasoning. First, § 211.63 was intended to safeguard a crude oil purchaser's rights under the DOE allocation regulations and to warrant that the purchasers continue to receive crude oil. Second, in enacting § 211.63, DOE determined as a matter of policy that advance consent to terminate and/or waiver clauses would be valid, provided that the contract contained a specific termination date. The rationale behind requiring a specific termination date was to ensure that when purchasers entered the market, they would know *precisely* how long the contract would continue and, thus, they could plan their operational existence in a way which would foresee a definite cessation of crude oil supplies. The purchaser would know that the contract would end on a date certain and could plan ahead to obtain alternate supplies to prevent a sudden dislocation of crude. However, when a contract contains a provision whereby it designates a specific initial term that *may* continue indefinitely at the option of either party, this takes the "option to terminate" outside the province of the "purchaser alone."

Put another way, if a term clause allows the supplier to continue a contract on a month-to-month basis after the initial term, the purchaser cannot be protected from the unexpected interruption of its crude oil supplies at the discretion of the supplier. This analysis is completely consistent with a plain reading of the Cibro-Sohio contract. In contending that August 31, 1979 is a specific termination date, Sohio is necessarily reading the phrase "and continuing thereafter unless terminated by either par-

ty ..." out of the contract. In the court's view, therefore, this phrase means that the contract will continue after August 31, 1979 unless terminated at the option of either party (not the purchaser alone), and consequently no specific termination date is contemplated. A specific termination date could not have been envisaged prior to execution of the contract because at that time there was no way for Cibro to ascertain precisely when Sohio intended to terminate the relationship. Until Sohio had actually given notice of termination, no termination date could be determined.

This court's analysis is supported by the DOE's subsequent interpretation in *Murphy Oil*, Interpretation 1981–17M, 47 Fed. Reg. 13,371 (April 1, 1982). In *Murphy Oil*, the Murphy Oil Corporation, a small and independent refiner, entered into a series of purchase/sale agreements with Ferguson Energy Corporation, a reseller of crude oil. The contracts stated that the relationship would be effective for an initial term of one month, and "continu[e] thereafter until cancelled by either party hereto on thirty (30) days advance written notice to the other party." [18] Thus, similar to the Cibro-Sohio contract, the contracts in *Murphy Oil* contained termination clauses which specified an initial term, but would remain in effect thereafter until and unless cancelled by either party giving advance notice.[19] Additionally, the contracts contained waiver clauses which specifically waived the protections of 10 C.F.R. § 211.-63.

DOE held that the termination clauses contained in the contracts did not constitute consent by Murphy to terminate the supplier/purchaser relationship in accordance with § 211.63(d)(1)(i). In reaffirming its *Arizona Fuels* and *Giant Industries* interpretations, DOE concluded that the contracts failed to specify a specific termi-

---

**18.** Additionally, the parties' most recent contract provided that "notice by either party shall constitute mutual consent for purposes of termination of the Supplier/Purchaser Relationship established pursuant to ... 10 C.F.R. 216.63." 47 Fed.Reg. at 13,771.

**19.** The only significant difference between the *Murphy Oil* contracts and the Cibro-Sohio contract is the length of the initial term: In *Murphy Oil*, one month, and in Cibro-Sohio, eleven months. Additionally, the parties in *Murphy Oil* were operating under the second phase of their contract.

nation date, and, thus, purported advance consent to terminate and/or waiver was ineffectual. DOE also specifically noted that *Arizona Fuels, Giant Industries* and *Southwestern Refining Co., Inc.*, Interpretation 1981–7 (March 12, 1981), made clear that "it was consistent with the objectives of the Emergency Petroleum Allocation Act ... to require that the purchaser's option to terminate be exercised in strict compliance with § 211.63(d)." *Id.* at 13,772 n. 4.

■ *Murphy Oil* clearly and compellingly supports this court's conclusion that paragraph 7 of the Cibro-Sohio contract contains an "evergreen" provision devoid of a specific termination date. The only way purchasers could minimize the number of unexpected disruptions of crude oil supply if crude became scarce was to specify a precise and definitive end date in the contract. By providing "evergreen" provisions which effectively give the supplier a preemptive right to terminate, the purchaser is forced, in direct contradiction to the express purposes underlying the EPAA, to secure supplies only by capitulating to the supplier's demand that the purchaser give advance consent to termination or waive any rights secured under Section 211.63. *See* 45 Fed.Reg. 29,770 (May 5, 1980).

The court also finds Sohio's reliance upon the *State of Alaska, Alaska Petrochemical Co.*, and *The Permian* interpretations misplaced. All of these interpretations have been substantially modified by subsequent DOE interpretations, and a careful analysis reveals that they were narrowly limited to the facts presented. The *State of Alaska* interpretation, for example, merely held that a waiver was valid to "permit termination of deliveries of crude oil in the event that the State of Alaska elect[ed] to take ... crude oil in kind as [a] royalty payment." 42 Fed.Reg. at 31,144. Although the FEA had expressly authorized the State to require its lessees to sign a waiver agreement and in turn to require its

lessees to include a similar provision in their leases, the waiver was expressly limited to the amount of royalty oil taken by the State of Alaska.[20] *Id.* at 31,143.

Similarly, DOE's subsequent interpretation in *Alaska Petrochemical Co.* merely confirmed that the waivers permitted in *State of Alaska* were limited to royalty oil in the State, specifically Prudhoe Bay. There is no suggestion in the interpretation that DOE had any intention of generalizing its limited waiver allowance concept beyond the royalty oil context. Indeed, DOE specifically noted that "[t]his interpretation is limited solely to the State of Alaska's royalty crude oil derived from North Slope production...." *Id.* at 5,799. DOE's decision was solely based upon a determination that it was "increasingly important for the State to find feasible means of retaining a portion of the North Slope crude production within the State." It is also important to note that neither of these interpretations even collaterally addresses the now central question of whether waivers must comport with the specific termination date concept. Similarly, the *Permian* interpretation does not address the question of whether a specific termination date is required to effectuate a waiver, and the decision was rendered under DOE regulations which were amended in June of 1976, prior to the time when there was a regulatory requirement that a specific termination date be included in any valid consent to terminate.

The previous discussion makes clear that the Cibro-Sohio contract fails to contain a specific termination date. As a consequence thereof, it cannot be said that plaintiff Cibro validly gave advance consent to terminate the contract on August 31, 1979. Moreover, based upon the various DOE interpretations herein analyzed, and based upon a policy analysis of the objectives underlying the EPAA, it is clear that paragraph 12 of the Cibro-Sohio agreement does not constitute a valid waiver in accord-

**20.** Thus, the fact that Sohio was a party to a supplier/purchaser waiver agreement with the State of Alaska at the time the parties entered

into their agreement is without dispositive legal significance in this case.

ance with 10 C.F.R. § 211.63.[21] The use of such a waiver provision in this case thwarts the legislative policy that the supplier/purchaser rule was designed to effectuate, namely, protection of a small and independent purchaser against the interruption of its crude oil supply by a major oil company.

### D. *Cibro's Putative Status as a Reseller*

Sohio has asserted as an affirmative defense that, assuming 10 C.F.R. § 211.63 operates to bar Sohio from terminating Cibro pursuant to paragraphs 7 and/or 12 of the supply agreement, it was nevertheless justified in unilaterally terminating Cibro pursuant to 10 C.F.R. § 211.63(d)(1)(iv)(A). Sohio claims that Cibro was a *de facto* reseller and not a small refiner with respect to all the ANS crude oil that was sold under the crude oil contract. Sohio also claims that it substantially complied with the requirements of § 211.63(d)(iv)(A) in providing Cibro with notice of termination. Cibro asserts that it holds the status of refiner not reseller, and thus § 211.63(d)(iv)(A) is inapplicble. Cibro alleges that it would have refined the ANS crude oil during the relevant damage period. Alternatively, Cibro argues that, assuming *arguendo* it is a reseller within the meaning of the regulation, Sohio failed to substantially comply with the stringent termination provisions therein contained.

In August of 1979 § 211.63(d) provided that a supplier/purchaser relationship could be terminated:

(iv) By a producer (as defined in Part 212 of this chapter) as to a reseller purchasing crude oil from that producer: *Provided,* that:

(A) At least thirty days in advance of any termination under this subdivision (iv), the producer shall give to the reseller purchaser from whose supplier/purchaser relationship is proposed to be terminated a written termination notice stating the date of termination, the source, quality, and estimated volume of crude oil involved (including the portions of that volume that are priced as lower tier crude oil, upper tier crude oil and uncontrolled crude oil under Part 212 of this chapter), and the name and address of the new reseller to which such crude oil is proposed to be sold.

A "reseller" within the meaning of § 211.63(d)(iv) is defined in 10 C.F.R. § 212.31 as follows:

"Reseller" means a firm (other than a refiner or retailer) or that part of such a firm which carries on the trade or business of purchasing covered products, and reselling them without substantially changing their form to purchasers other than the ultimate consumers.

The regulations further provide in 10 C.F.R. § 211.9(e) as follows:

*Dual capacities.* A supplier may act in the capacity of a wholesale purchaser and an end-user. A wholesale purchaser-consumer may also be a wholesale purchaser-reseller. A firm which is acting in one or more different capacities shall comply with the appropriate regulations governing each capacity in which it acts.

Thus, for Sohio's termination to have been proper (1) a new reseller was required to be substituted for the existing reseller; (2) notice and filing requirements must have been strictly observed; and (3) all small

---

**21.** The court finds Sohio's waiver argument with respect to U.C.C. § 2–209(5) without merit. Moreover, the court finds that the phrase "and continuing thereafter" does not make the contract unenforceable for lack of a definite length within the meaning of U.C.C. 2–309(2). Additionally, as Judge Foley implicitly concluded in his Memorandum-Decision and Order of June 6, 1980, this court is not bound exclusively to DOE interpretations rendered at the time the parties entered into their agreement. Indeed, Judge Foley noted, among other things, that "several important aspects of these [prior] interpreta-tions of § 211.63 were clarified in … *Arizona Fuels.*" *See, Cibro Petroleum, supra,* at 4. Judge Foley noted that the interpretation given in *Arizona Fuels* underscores the necessity to construe the waiver principle strictly: "To do otherwise would necessarily cause the exception to the supplier/purchaser regulation to eviscerate the general rule in a manner inconsistent with the purposes of the [EPAA]." *Id.* at 5. Thus, Sohio's argument that later DOE supplier/purchaser interpretations should not receive retroactive deference from the court has already been rejected.

refiners in the chain of distribution must have consented to the termination.

Additionally, a producer is required under the regulation to give 30-days notice of the substitution listing and, among other things, give the identity of the new reseller.[22] Each reseller who received a "substitution notice" was then required to renotice downstream customers as follows:

> (B) Any reseller that has received a termination notice from a producer as provided in subclause (A) of this subdivision, which proposed termination would effect a reduction in deliveries of crude oil by that reseller, either directly or through exchanges, to any refiner or other reseller shall:
>
> (1) Within 10 days of receipt of the termination notice, provide a copy of the termination notice, together with a statement as to the volume, quality, and price level of crude oil involved for the particular purchaser, to the purchasers of the crude oil subject to such termination notice.

211.63(d)(vi)(B)(1).

The existing reseller was also required to inform the new reseller of the identity of its customers. Subsection (d)(1)(iv)(2) provides:

> At the same time that the notices required under subclause (b)(1), of this subdivision, are provided, provide copies of such notices to the proposed new purchaser, including the name and address of each person to which a copy of the termination notice was provided and the volume, quality, and price level of the crude oil affected for each such person.

The proposed new reseller was then required to make a written offer to supply the refiner at the end of the chain of distribution:

> The proposed new purchaser of the crude oil shall make a written offer to continue to supply the volume of that crude oil to each refiner provided with a copy of the termination notice as that

refiner would otherwise lose as a result of the proposed termination.

211.63(d)(iv)(C). Subsection (d)(1)(iv)(D) further provides that:

> Upon the acceptance or rejection of the offer or offers under subclause (C) of this subdivision by the refiner or refiners concerned, the proposed new purchaser may be substituted by the producer for the purchaser whose supplier/purchaser relationship has been proposed to be terminated. *Provided,* that, if a small refiner that was notified as to a proposed termination does not accept the offer of the proposed new purchaser, the proposed termination shall not be effective as to the volume of the crude oil being delivered to that small refiner.

*Id.*

In the instant case the court need not reach the issue of whether Cibro is a "reseller" within the meaning of 10 C.F.R. §§ 212.31 or 211.9(e) because Sohio failed to comply with the stringent termination requirements under 10 C.F.R. 211.-63(d)(1)(iv).

First, Sohio's "termination" did not comply with the specific "notice" and "offer" requirements of the regulations. In its notice of termination sent to Cibro on January 23, 1979, *see* Plaintiff's Exhibit No. 4, Sohio merely confirmed that the contract would terminate on August 31, 1979. However, and fatal to Sohio's claim that § 211.63(d)(1)(iv) is applicable, the notice failed to identify a new reseller. Without the identity of a new reseller, there could be no proper substitution, and the "ultimate refiner" of the crude was deprived of the opportunity to establish a supplier/purchaser relationship with the new reseller. *See generally, Basin, Inc.,* Interpretation 1980–6, 45 Fed.Reg. 25,376 (April 15, 1980); *Husky Oil Co.,* Interpretation 1977–15, 42 Fed.Reg. 31,150 (June 20, 1977).

Second, and particularly relevant in light of Sohio's claims that it substantially complied with the regulations, Sohio failed to ever substitute another reseller for Cibro.

---

**22.** Notice of the identity of the new reseller was required in order to give the downstream customers an opportunity to purchase crude oil from the new reseller.

The testimony at trial makes clear that rather than substitute another reseller for Cibro, Sohio either retained the crude oil for its own use or sold it to another refiner. Mr. Hesketh, Sohio's representative, testified that Sohio had the intention of selling the crude originally allocated to Cibro to people on the West Coast with the ability to refine the oil, "some who already were customers and wanted extra quantity, and some new ones." Mr. Hesketh further testified that most of these people were small refiners or major refiners, but not resellers. Additionally, Mr. Michael W. Press, a representative of Sohio's ANS crude oil operation, testified that it was impossible to determine precisely what happened to the 15,000 barrels of crude oil per day that were taken out of the Cibro-Sohio contract. Mr. Press concluded that because this oil was particularly fungible, all that could be said was that it was "taken off the Gulf Coast and put on the West Coast."

Sohio failed to show at trial that it supplied crude oil taken from Cibro to another reseller. And, as noted above, § 211.63(d)(iv) only permits a producer to substitute one reseller with another. For the provision to properly operate, the ultimate refiner must stay the same. Because Sohio failed to comply with this requirement, it cannot rely on § 211.63(d)(iv) as a justification for Cibro's termination. Sohio did not substantially comply with the regulations in its termination of Cibro.[23]

## IV

### A. *Preliminary Statement*

Plaintiff Cibro originally filed a complaint in September, 1979 alleging that Sohio had failed to negotiate in good faith with respect to contract prices for the months of July and August, 1979. There-after, in June, 1980, Cibro amended its complaint to allege three counts of improper price renegotiation against Sohio. The original price complaint, redrafted as the third count to Cibro's amended complaint, was discontinued by Cibro in November, 1983. The remaining counts continued to be unresolved and were consolidated for trial with Cibro's contract and regulatory cause of action. However, at trial Cibro withdrew its "good faith" price claim, and limited its proof exclusively to the February 8, 1979 increase. *See* Trial Transcript at 851.

### B. *Cibro's Price Claim*

Cibro's amended complaint alleges that on February 8, 1979 Sohio impermissibly requested a $.17 per barrel increase on crude oil,[24] effective January 16, 1979 through April 1, 1979, in violation of paragraph 5 of the parties' agreement. Paragraph 5(d) provides in relevant part as follows:

> *OPEC Price Change Reopener.* In the event of a change in the official selling price of the OPEC marker crude either party may request a Price Reopener during the preceding ninety (90) days. In such event, the negotiation and termination procedure of the General Price Reopener shall prevail.

*See* Plaintiff's Exhibit No. 3, ¶ 5(d). Cibro claims that the February Reopener was invalid because there had been no such change in the official selling price of OPEC marker crude in conjunction with Sohio's request. Rather, Cibro maintains that Saudi Arabia had unilaterally decided to raise its production of crude by one million barrels per day (electing to raise its price only on the one million barrel per day excess)

---

23. Sohio has also taken the position that its noncompliance with the regulations should be excused because Cibro failed to inform Sohio of its reseller status. The court has found no legal foundation for this position. Moreover, the testimony at trial revealed that representatives of Sohio, *e.g.,* Messrs. Snively and Hesketh, knew early on that Cibro was reselling at least some portion of its crude.

24. Sohio's February 8, 1979 proposal was actually for a $.25 per barrel increase. Sohio subsequently reduced the proposed increase and effective date of the price increase on March 2, 1979. *See* Plaintiff's Exhibit No. 9.

such that there was no change in the official selling price of OPEC marker crude.

Cibro has also taken the position that the $.17 per barrel increase violated the express terms of paragraph 5(b) of the supply agreement. Paragraph 5(b) provides in relevant part as follows:

> *Price Renegotiations.* Either party may from time to time ..., deliver written notice (a 'Reopener Notice') ... initiating a renegotiation with respect to the price to be paid ... provided, however, a party shall not be entitled to give Reopener Notice if such party has already delivered such a notice to the other party within the preceding ninety (90) day period.[25]

*See* Plaintiff's Exhibit No. 3, ¶ 5(b). Cibro claims that the February, 1979 increase was impermissible under this provision because Sohio had already requested an increase on December 26, 1978, *see* Plaintiff's Exhibit No. 6, within the express 90-day limitation.

Sohio has taken the position that the Saudi Arabian increase did constitute "a change in the official selling price of the OPEC marker crude" and, thus, its February Reopener did not constitute breach of contract. In the alternative Sohio claims that Cibro, by its course of performance, accepted the price increase sought on January 16, 1979, thereby waiving any protection afforded under paragraph 5(d) of the contract. *See* U.C.C. § 2–208(1). Additionally, Sohio maintains that, assuming *arguendo* the February request did not comport with paragraph 5(d), Cibro's consent to accept Sohio's proposed price increase served as a novation or modification of the contract expressly permitted under U.C.C. § 2–209.[26] Sohio claims that, notwithstanding the terms of paragraph 5, because its increase was commercially fair and reasonable under paragraph 17, the $.17 per barrel increase was permissible. Finally, Sohio takes the position that Cibro failed to prove damages on this question. Sohio claims that Cibro was able to pass the $.17 increase directly to its customers through resales and indirectly through refining, and thus it is not entitled to a $.17 windfall.

### 1. *Cibro's Proof at Trial*

Cibro's proof with respect to the price claim came from essentially two witnesses, Nicholas W. Cirillo, Cibro's Vice President in charge of supply and distribution, and Malcolm M. Turner, Cibro's expert in refinery economics, refinery process design and crude oil evaluation and acquisition.

Mr. Cirillo testified that in direct response to the Iranian oil embargo of 1979, in February of that year Saudi Arabia increased its production of crude oil and charged a higher price on the incremental volumes of crude. Mr. Cirillo testified that Cibro received a telex from Sohio on February 8, 1979, wherein Sohio requested a $.25 increase effective January 1, 1979.[27] *See* Plaintiff's Exhibit No. 7. He further testified that Sohio had requested its last general price increase on December 26, 1978, and, consequently, the requested increase would only have been valid if the official selling price of OPEC marker crude oil had changed.

Mr. Cirillo stated that Cibro's representative, Enrique Carrero, responded by telex

---

**25.** Upon receipt of a valid reopener notice, both parties must negotiate in good faith for a period not to exceed 30 days. If the parties are unable to agree on a new price within the 30-day period, either party may terminate the agreement by delivering a written notice of termination within 35 days following the delivery of the Reopener Notice. If such a notice of termination is delivered, either party may then elect to continue the contract for a 90-day period following the delivery of the Reopener Notice at the last price proposed by the other party.

**26.** Sohio also claims that this "novation" was expressly authorized under paragraph 17 of the supply agreement.

**27.** The telex read in relevant part as follows: As a result of the recent official announcement by the Saudi Arabian Government to increase the selling price of Saudi Arabian Crude Oil, Sohio, under the terms of our North Slope Crude Oil Agreement with you is hereby re-opening the price of crude oil sold to you thereunder. Sohio proposes the new price of oil be increased 25 cents per barrel effective January 1, 1979.

to Sohio's request, accepting the retroactive increase provided that the request reflected an increase in the official price of OPEC crude and that Sohio charged all its contractual customers with the increase. *See* Plaintiff's Exhibit No. 8.[28] Mr. Cirillo further testified that, to his knowledge, there had not been such a change in the official selling price of OPEC marker crude oil. According to Mr. Cirillo, Cibro accepted the increase solely because Sohio could have terminated the supply agreement if it refused.

Cibro's expert, Mr. Turner, stated in unequivocal terms that there was no change in the official price of OPEC marker crude in January of 1979. Although Mr. Turner initially suggested that action by a single nation could effect the official selling price of crude, *see* Trial Transcript at 391, he clarified his earlier testimony by stating that unilateral action was not sufficient to satisfy paragraph 5(d) of the Cibro-Sohio contract. *See id.* at 403. Mr. Turner's testimony remained intact upon intense cross-examination. Moreover, Sohio failed to introduce any evidence to refute plaintiff's claim that the unilateral increase did not constitute an official OPEC marker change.

Cibro is clearly entitled to prevail on its price claim. Sohio failed to introduce any evidence suggesting that the Saudi Arabian increase was the kind of "official increase" contemplated in paragraph 5(d) of the parties' supply agreement. The testimony of Mr. Cirillo and Mr. Turner remained uncontroverted. Their testimony established that unilateral action by one country does not constitute an increase in the official OPEC marker price. Moreover, because Sohio cannot rely on paragraph 5(b) of the supply agreement to justify its increase, Cibro is entitled to recoup its $.17 per barrel overpayment.

Although quite creative, all of Sohio's technical arguments, ostensibly militating in favor of denying Cibro's price claim, are without legal justification. Sohio initially argues that Cibro was grossly dilatory in filing count I because reasonable commercial practice would dictate that Cibro notify Sohio seasonably of its objection to the price increase. Relying upon U.C.C. § 2–209, Sohio has taken the position that Cibro's telex of February 9, 1979 did not constitute an objection to Sohio's proposal. Moreover, Sohio argues that this telex does not constitute acceptance under protest within the meaning of the Uniform Commercial Code. Additionally, Sohio claims that Cibro failed to object to future increases, thereby waiving any objections contemplated within U.C.C. § 2–209(5). *See also* U.C.C. §§ 2–208(1) and 2–208(3).

The defendant is engaging in sophistry. These arguments fail to address the simple fact that Cibro did object to the increase, albeit conditionally. As noted previously, Cibro's reply telex of February 9, 1979 stated in unequivocal terms that acceptance was predicated upon "the understanding that [the increase] will be applicable to all contractual customers and that *it will absolutely reflect the increase in the official price of Saudi Arabian Marker Crude ...*" *See* Plaintiff's Exhibit No. 8 (emphasis added). Thus, to the extent that the increase was not pursuant to a change in the official OPEC marker crude price, the acceptance was retracted. As Mr. Cirillo testified, once this initial objection was lodged, there was "no sense in reobjecting." Furthermore, because Cibro merely conditionally accepted the increase, Sohio's argument that the proposed price increase served as a novation or modification of the contract is without merit.

Sohio's reliance upon paragraph 17 of the Cibro-Sohio contract is similarly misplaced. Sohio takes the position that, notwithstand-

---

**28.** Cibro's reply telex read in relevant part as follows:

Re: Your telex Feb. 8, 1979 advising an increase of approximately 0.25 dlrs/bbl on the price of North Slope retroactive to January 1, 1979 and as per telcom Carrero/Hesketh Feb.

9, 1979, we hereby accept it under the understanding that it will be applicable to all contractual customers and that it will absolutely reflect the increase in the official price of Saudi Arabian Marker Crude retroactive to January 1, 1979.

ing the express terms of paragraphs 5(b) and 5(d), there was no reason why Sohio could not ask for a price increase based upon the Saudi increase under paragraph 17.[29] However, this view fails to acknowledge that the contract specifically provided Cibro price protection by limiting the number of times Sohio could request an increase and by tying any other increases to the official selling price of OPEC marker crude oil. In other words, Sohio's view, if accepted, would render nugatory paragraphs 5(b) and 5(d) of the contract.

### 2. Permissible Damages

██ Cibro has sought damages under its price claim of $.17 per barrel for crude oil purchased from the time of the increase through August 31, 1979 in the amount of $559,327.84. However, the court agrees with Sohio that plaintiff is only entitled to damages in the amount of $191,973.84, representing the $.17 increase from January 15, 1979 through April 1, 1979, the date when Sohio was next permitted to ask for a general price increase. The applicable price renegotiation clauses, paragraphs 5(b) and 5(d), expressly leave the amount of increases to the "good faith" negotiation of the parties. Clearly, Sohio would have sought an increase of $.17 per barrel in its subsequent April 1, 1979 Reopener had it definitively known that its February 9, 1979 increase was impermissible. Cibro argues, nevertheless, that a $.17 increase in April of 1979 would not have been in good faith because "Sohio was not entitled to a price increase whenever it wanted one." However, both Mr. Cirillo and Mr. Turner testified that during the relevant period a $.17 increase was commercially reasonable and fair. Thus, the court finds that, owing to the Saudi Arabian increase, a $.17 increase in April of 1979 would have been

reasonable and made in good faith within the meaning of paragraph 5(b) of the supply agreement.[30]

## V

The final substantive issue to be determined in this case is whether notice of termination could have effectively been given prior to August 31, 1979. If notice could not have been given until after the expiration of the initial term, i.e., after August 31, 1979, Sohio was contractually obligated to supply crude oil to Cibro through February 29, 1980. Resolution of this cause of action also depends upon the court's interpretation of paragraph 7 of the parties' contract. As previously noted, paragraph 7 provides in full as follows:

> The term of this Agreement shall be for a period of 11 months commencing on October 1, 1978, and ending on August 31, 1979 and continuing thereafter unless terminated by either party providing not less than six (6) months' notice of termination in writing.

Sohio has taken the position throughout this litigation that a plain reading of this clause reveals that its term was eleven months, commencing on October 1, 1978 and ending on August 31, 1979 with a potential continuation after the initial term, unless notice of termination had been provided by either party not less than six (6) months prior to the end of the term. Sohio contends that, because the contract contains no express limitation with respect to when notice of termination can be given, such notice could be given at any time after the commencement of the contract. Cibro contends that a plain reading of the contract reveals that notice could not be given until after the initial term expired and,

---

**29.** Paragraph 17 provides in full as follows:

*Entire Agreement*

The terms and conditions herein contained constitute the entire Agreement between the parties and shall supersede all previous communications, representations and agreements either oral or written between the parties hereto with respect to the subject matter hereof. This Agreement may not be modified except

in writing executed by the duly authorized representatives of Seller and Buyer, respectively.

**30.** However, the court does not believe that Sohio. was entitled to recover, retroactively, the $.17 per barrel increase for the first two and one-half months of 1979 in its subsequent April 1, 1979 Reopener.

thus, the contract had a minimum term of seventeen (17) months. In the alternative Cibro argues that, in the absence of any express contractual language limiting the effective date for notice, the court necessarily must look to extrinsic evidence in determining the term of the contract. Sohio vehemently contends that the parol evidence rule should operate to bar the introduction of any and all evidence in this case because (1) the contract contains an integration clause, and (2) the contract is unambiguous.

A. *Parol Evidence Objections*

Throughout the trial in this case the defendant lodged a continuing objection to the introduction of any parol evidence, including documents and testimony, relating to Cibro's "contract cause of action." The court reserved decision on the admissibility of this evidence at trial and will now make that determination. For the reasons which follow the court finds that paragraph 7 is wholly ambiguous with respect to when notice of termination could be given and, consequently, parol evidence is admissible to assist the court in determining its meaning. Accordingly, the defendant's continuing objection to the introduction of the evidence herein examined is overruled.

As a preliminary matter, the court notes that the parol evidence rule is a matter of substantive law, and, therefore, state law is controlling on this question. *See Vanston v. Connecticut General Life Insurance Co.*, 482 F.2d 337, 340 n. 1 (5th Cir.1973); *Plum Tree, Inc. v. N.K. Winston Corp.*, 351 F.Supp. 80, 83 (S.D.N.Y. 1972); *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597, 606 n. 5 (S.D.N.Y.1971); 1A Moore's Federal Practice ¶ 313 (1978). Thus, as indicated earlier in this decision, Ohio law will resolve the parol evidence questions in this case by virtue of paragraph 15 of the Cibro-Sohio contract.[31] The court notes, however, that the applicable code provisions for New York and Ohio are identical. *See Baumgold Bros., Inc. v. Allan Fox, Co., East*, 375 F.Supp. 807, 812 (N.D.Ohio 1973).

It is hornbook law that the primary inquiry in cases involving the interpretation and construction of contracts is the ascertainment of the intention of the parties, and that such intention is to be gathered from the language of the instrument. 3A Corbin, *Corbin on Contracts*, § 543 at 130 (1960). If the language employed in the contract is clear and unambiguous, the contract must be enforced, without reference to extrinsic facts. *Id.* Thus, the parol evidence rule excludes extrinsic evidence offered to vary or contradict, rather than to explain and interpret, the terms of an integrated contract. *Pennzoil Company v. Federal Energy Commission*, 645 F.2d 360, 388 (5th Cir.1981).

As a general proposition, therefore, the parol evidence rule provides that, where the parties have reduced their agreement to writing, evidence of prior or contemporaneous agreements may not be offered to contradict, vary, or subtract from the terms of the writing. *See Restatement (Second) of Contracts* § 213 (1981). This rule prohibits a party from claiming that a prior agreement alters the final agreement if the final agreement contains an integration clause. *See Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106 (6th Cir.1979). If the contract is unambiguous, all extrinsic evidence should be excluded, and the court's inquiry is limited to the "four corners" of the agreement. As was aptly stated in *City of Oglesby v. FERC*, 610 F.2d 897 (D.C.Cir.1979): "[i]n the absence of ambiguity the intent of the parties to a contract must be ascertained from the language thereof without resort to parole evidence or extrinsic circumstances." *Id.* at 905.[32] *See also* 3A Corbin, *Corbin on Contracts*, § 573 at 357 (1960).

---

31. Since the contract in dispute involves oil, which clearly is "goods" within the meaning of U.C.C. § 2–102, Ohio's parol evidence rule as codified in § 2–202 is applicable. *See generally,* *Morrison v. Devore Trucking, Inc.*, 68 Ohio App.2d 140, 428 N.E.2d 438 (1980).

32. It should also be noted that U.C.C. § 2–202 permits evidence of trade usage, course of deal-

■ However, if the contract is ambiguous, extrinsic evidence may be considered to determine the parties' intent, *see Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660 (8 Cir.1981), and to determine the meaning of the language contained therein, *Hawes Office Systems, Inc. v. Wang Laboratories, Inc.*, 524 F.Supp. 610 (E.D.N.Y.1981). "Where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of the contracting." *Long Island Airports Limousine Service Corp. v. Playboy-Elsinor Associates*, 739 F.2d 101 at 103 (2d Cir.1984) (quoting *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 10 (2d Cir.1983).) Ambiguity often arises from the application of the contract to the subject matter of the agreement, and extrinsic evidence is admissible to remove and explain the ambiguity in the contract as applied. *Id.* Relevant parol evidence is always admissible to assist in the determination of what the words used in the contract mean. *Ortman v. Stanray Corporation*, 437 F.2d 231 (7th Cir.1971). It is, however, critical to keep in mind that, while it is permissible to consider extrinsic evidence to interpret an integrated contract, extrinsic evidence is not admissible to *alter or vary* the terms of the agreement. *Id.*

Section 2–202 of Ohio's Uniform Commercial Code provides in substance that:

[I]f the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement, then the writing alone constitutes the contract. This is to say no more than if x is the contract, then x is the contract. As a corollary, the rule also says that to the extent the writing incorporates terms the parties agreed on, then the writing controls as to those terms and anything contradicting or inconsistent is of no force or effect. This is to say no more than to the extent x is the contract, x is the contract to that extent.... The theory is that either the writing or the other

ing, and course of performance to be considered

evidence may control terms, depending on which represents the agreement of the parties.

White and Summers, Uniform Commercial Code, §§ 2–9, 2–12 (2d ed. 1980).

Thus, under Ohio law the court may conclude that the Cibro-Sohio contract is not a final written expression of the parties' agreement and admit extrinsic evidence. Additionally, the court may decide that the contract is a final written expression of some terms, but not as to all terms, and admit evidence of consistent additional terms. Alternatively, the court may find that the contract is a complete exclusive statement, but admit extrinsic evidence of dealing, usage of trade, or course of performance to "explain," but not "contradict" the meaning of terms in the writing.

■ Applying these various concepts to the instant case, it is clear that extrinsic evidence must be utilized in interpreting paragraph 7 of the Cibro-Sohio contract. Here, it cannot be said that the term clause at issue is wholly unambiguous. Rather, as both parties implicitly concede, there is no express language concerning when effective notice can be given. Thus, without any specific language limiting the effective date of notice, it is reasonable to assume that notice could be given at any time during the contract period. On the other hand, it is equally plausible to conclude that absent such a limitation, notice could only be given after the expiration of the initial term.

A careful textual analysis of paragraph 7 will not resolve these equally reasonable, but diametrically-opposing interpretations. On the one hand, focusing on the phrase "and continuing thereafter *unless* terminated by either party providing not less than six (6) months' notice of termination ...," the use of the conjunction "unless" seems to suggest that the contract will only continue on a contingent basis, and, consequently, notice to terminate can be given prior to the expiration of the initial term. This is so because if the contract

absent a finding of ambiguity.

has the potential to be of a definite nature, then allowing notice to be given only after the initial term has expired would continue the contract beyond the date contemplated by the parties. In other words, the use of the target conjunction can be read to mean a condition or option to terminate, which suggests that unless the option was exercised the contract would expire on a date certain, in this case August 31, 1979. On the other hand, if the phrase "shall be for a period of 11 months commencing on October 1, 1978 and ending on August 31, 1979 ..." is read together with the phrase "and continuing thereafter unless terminated by either party ...," the language seems to suggest that the notice may not precede expiration of the initial term. The conjunction "and" serves to join the two phrases thereby suggesting that notice is conditioned upon expiration of the initial term.

The preceding discussion makes clear that there simply is no way to ascertain from a plain reading of paragraph 7 when effective notice of termination could have been given under the contract. Therefore, the court is forced to resolve this ambiguity by reference to the parties' negotiations,[33] trade usage and custom,[34] documentary evidence submitted to the court and other indicia of the parties' intent.[35] At the outset, however, the court notes that any ambiguity in the interpretation of the contract must be construed most strongly against the drafting party, in this case defendant Sohio:

> To the extent that a contract is susceptible of two constructions by reason of doubt or uncertainty as to the meaning of ambiguous language, it is to be construed most strongly or strictly against the party by whom, or in whose behalf, the contract was prepared or the ambiguous language was used, and liberally and most strongly in favor of the party who is not the author, and not responsible for the use, of the language giving rise to the doubt or uncertainty....

*Eastmount Construction Co. v. Transport Manufacturing & Equipment Co.*, 301 F.2d 34, 41 (8th Cir.1962) (citations omitted). *See also McKay Machine Co. v.*

---

**33.** Consistent with New York's version of the U.C.C., Ohio's Code allows the surrounding circumstances of contract negotiations to be used in interpreting the meaning of an ambiguous contract. U.C.C. § 2–202. *See also* Preamble to U.C.C. § 1–205 which states:

> PURPOSES: This section makes it clear that:
> 1. *This Act rejects both the "lay-dictionary" and the "conveyancer's" reading of a commercial agreement. Instead* the meaning of the agreement of the parties is to be determined by the language used by them and by their action, *read and interpreted in the light of commercial practices and other surrounding circumstances.* The measure and background for interpretation are set by the commercial context, which may explain and supplement even the language of a formal or final writing.

**34.** In his Memorandum-Decision and Order of October 25, 1979, Judge Foley noted that U.C.C. § 2–202 is applicable here. Moreover, Judge Foley concluded that "the merger clause [in this case] is not sufficiently specific to prevent evidence of course of dealing, usage of trade, or course of performance to explain the meaning of the contract terms, even if ambiguous." Relying upon Official Comments accompanying applicable U.C.C. sections, *see* U.C.C. §§ 1–201(3), 1–205(2), Judge Foley concluded that "reference to the Official Text and Comments ... underscores that proper contract interpretation necessitates an examination of the ante-

cedent conduct of the parties and the commercial circumstances surrounding their bargaining." *Cibro Petroleum Products, Inc. v. Sohio Natural Resources Co.*, No. 79–CV–446, slip op. at 8–9 (N.D.N.Y. Oct. 25, 1979). *See also Paragon Resources, Inc. v. Natural Fuel Gas Distributing Corp.*, 695 F.2d 991 (5th Cir.1983).

**35.** Defendant Sohio has taken the position that the merger clause contained in paragraph 17 excludes the utilization of any extrinsic evidence in this case. However, as noted above, even where there is an intent to make a writing final, the writing may still be explained or supplemented by (1) course of dealing, trade usage, or course of performance; and (2) by extrinsic evidence of consistent additional terms *unless* the court finds that the writing is intended to be a complete and final statement of the terms of the agreement. In the instant case, however, Cibro is merely attempting to "explain" the term clause, not introduce evidence of consistent additional terms. Because plaintiff is not attempting to contradict the language of paragraph 7, the parol evidence rule does not operate to exclude extrinsic evidence offered for otherwise valid purposes. Thus, the admonitions contained in, *e.g., Eskimo Pie Corporation v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987 (S.D.N.Y. 1968), are inapplicable in this case.

*Rodman,* 11 Ohio St.2d 77, 228 N.E.2d 304 (1967); *Smith v. Eliza Jennings Home,* 176 Ohio St. 351, 199 N.E.2d 733 (1954); and *Toulmin v. Becker,* 67 Ohio 109, 124 N.E.2d 778 (1954).

## B. *Expert Testimony*

At trial each party presented expert testimony with respect to when notice of termination could have been given in accordance with paragraph 7 of the Cibro-Sohio contract. However, as the following discussion makes clear, this testimony is of little assistance in resolving this issue.

Plaintiff's expert, Malcolm Turner, testified that in the oil industry two basic categories of term clauses are utilized. The first is a "fixed term" contract where the term of the agreement is expressly defined. These contracts specifically limit the term of the contract and identify a particular "end date." The other basic type of supply contract is a "continuing contract," that is, a contract which has a continuing or perpetual term. This type of contract has two constituent elements: one is a base term and the second is a notice term. For example, in a "division contract," whereby a buyer agrees to take crude oil from a seller on a lease basis, the base term is monthly and the notice provision is typically 30 days. Mr. Turner also identified annual continuing contracts which he indicated were typical crude oil contracts that provide longer notice provisions. Mr. Turner stated that unless specifically modified by contract language, the notice term is always added to the base term of the contract; that is, the minimum term of the contract is the sum of the two term components.

More specifically, Mr. Turner testified that under the Cibro-Sohio contract, industry practice suggests that the term was a minimum of 17 months and continuing thereafter unless terminated. By implication, therefore, notice of termination could not have been given until after the expiration of the 11-month period. However, Mr. Turner admitted that he had no personal experience with 11-month base contracts and that the Cibro-Sohio notice provision

was unusual in that most such clauses contain 30 to 90 day notice provisions.

Sohio's expert witness, Mr. William H. Blackledge, testified in unequivocal terms that both the Cibro-Sohio draft contract, *see* Plaintiff's Exhibit No. 16, and the actual contract, *see* Plaintiff's Exhibit No. 3, could have been terminated at any time during the initial term period. According to Mr. Blackledge, notice of termination under the draft contract could effectively have been given as early as September of 1978; notice under the final contract could have been given as early as October of 1978. Mr. Blackledge further stated that the contract could properly have been terminated on August 31, 1979 provided notice of termination was given before the end of February, 1979. Mr. Blackledge also expressed his opinion that while a restriction upon when notice may be given is unusual, it would not be improper to so provide a specified date prior to which notice of termination could not be given. However, according to Mr. Blackledge, unless there is such language in a petroleum contract, notice can be given at any time. Mr. Blackledge expressed the view that, even when a contract expressly designates that notice may be given at any time during the initial term, such wording is mere surplusage because the standard practice in the petroleum industry is that notice can be given at any time unless expressly prohibited.

The court is initially inclined to give particular weight and credibility to the testimony of Mr. Blackledge. Mr. Blackledge was employed by the Gulf Oil Corporation for 43 years and spent most of his career trading crude oil. During that period he negotiated approximately 500 crude oil contracts. Throughout his testimony Mr. Blackledge steadfastly asserted that notice of termination can be given at any time under these types of supply contracts. On the other hand, Mr. Turner was equally resolute in his assertion that, under prevailing petroleum industry practice, the Cibro-Sohio contract must be construed as containing a minimum 17-month term wherein notice of termination could only have been

given after expiration of the 11-month base period. Mr. Turner also stated that the Cibro-Sohio contract was atypical in that the base term and notice provisions were unusually long.

 In view of this diametrically-opposed testimony, the court finds the views expressed by the experts inconclusive on the ultimate question of when notice could have been given under the contract. Both of the views expressed by the experts are plausible and are apparently supported by general petroleum industry practice. More importantly, however, the court finds the testimony unsustaining because both experts identified the Cibro-Sohio contract as being atypical. Thus, an analysis of the Cibro-Sohio contract purely in terms of prevailing industry practice will not necessarily reveal the intent of the parties in this case. By virtue of the contract being atypical, the parties by definition may have been departing from generalized petroleum industry practices with respect to drafting the term clause. Accordingly, the court is compelled to look at additional indicia of the parties' intent in making a determination of the proper interpretation of paragraph 7.

### C. Contract Negotiations

At the parties' initial meeting in Houston, Texas, Cibro made it clear to Sohio that it was seeking a secure long-term source of crude oil. Mr. Cirillo testified that Cibro's Albany refinery was nearing completion and that Cibro needed an immediate and long-lasting source of crude. Sohio's representative, David Snively, acknowledged that Sohio understood Cibro's needs but indicated that Mr. Cirillo was told that Sohio could "only go about three to five years." [36]

The first written communication between the parties with respect to the length of the contract occurred in March of 1978. On March 28, 1978 Mr. Snively sent a telex to Cibro proposing the following term: "one year commencing July 1, 1978 and 90 days thereafter unless cancelled by either party giving 90 days notice." See Plaintiff's Exhibit No. 11. Mr. Bohlmann testified that this initial term proposal was interpreted by Cibro as an offer of an evergreen contract with an initial period of one year and a 90-day notice of termination which could not be given until after the initial term, thus being a 15-month contract. [37]

Thereafter, on April 21, 1978, representatives of the parties met in New York City to discuss the terms of the proposed contract. There was conflicting evidence on precisely what the parties proposed. While both parties agree that Cibro again indicated that it was seeking a long-term contract with an evergreen provision, the parties disagree about Sohio's amenability to this proposal. Sohio argues that Cibro's representatives were advised in emphatic terms that Sohio's crude oil marketing strategy had changed from an emphasis on East Coast sales to West Coast sales and that a multi-year contract was, therefore, unacceptable.

Mr. Snively testified on direct examination that Cibro was told that Sohio "could only write a one-year contract, nothing longer." Mr. Snively acknowledged that Cibro proposed a one-year contract with a one-year cancellation notice, such notice to be given on the last day of the first term, but indicated that he advised Cibro that management was not likely to accept such a proposal. Sohio, thus, admitted that during the April 21 meeting the concept that notice could not be effectively given until after the end of the initial term was specifically discussed. Although Mr. Snively testified on direct examination that this concept was unacceptable, he admitted on cross-examination that he may have told

---

**36.** Mr. Cirillo was not in attendance at the November, 1977 meeting. He was, however, present at the April 21, 1978 meeting.

**37.** Mr. Snively understood the proposal to be a term of one year with an evergreen provision which would allow either party to terminate the agreement by giving at least 90 days notice but that neither party could cause deliveries to stop prior to the end of the initial period of one year. See Plaintiff's Exhibit No. 49.

Cibro that he would take the concept back to Sohio "but [Cibro was] told ... [that] it isn't going to go."

Mr. Snively's deposition, which was partially introduced into evidence at trial, suggests that he did indeed tell Cibro that the two-year contract proposal would be conveyed to Sohio personnel: "I [will] take it back, but I ... do not believe that ... my management committee will [accept] a two-year contract." Both parties agree that at this point in time the contract terms still remained unsettled. At the end of the April 21 meeting, Cibro agreed to provide Sohio with a draft proposal on the term and notice provisions of the contract.

On May 4, 1978 Mr. Bohlmann sent a telex to Sohio which proposed the following term clause: "shall be for a period of one year commencing with the date of first delivery (estimated to be September 1–15, 1978) and evergreen thereafter subject to one year's prior written notice of cancellation." Both Cibro and Sohio clearly understood this proposal to be a two-year contract; i.e., notice of cancellation could not be given until after the expiration of the initial one-year term. *See* Plaintiff's Exhibit No. 14; Defendant's Exhibit AX. However, Mr. Bohlmann, whose unwaivering testimony was a constant source of regalement, indicated that the language contained in the May 4th telex was a clever means of pushing through a longer term contract. Mr. Bohlmann testified on cross-examination that Mr. Hesketh, Sohio's Chief Negotiator, had "caught [his] little way of getting in a longer term contract."

Thereafter, on June 2, 1978, Mr. Hesketh responded to Cibro's proposal via telex stating as follows: "regret we are unable to agree to one year's notice of cancellation after the initial year, but would be willing to increase our proposed notice to six months." *See* Plaintiff's Exhibit No. 15. Significantly, the telex language specifically speaks in terms of notice of cancellation *after the initial year.* Mr. Bohlmann testified that, upon receipt of this telex, he assumed that Sohio had compromised its earlier proposal as expressed in its telex of May 4, 1978. Mr. Bohlmann further testified that his understanding was validated in subsequent conversations between himself and Mr. Hesketh.[38] On direct examination Mr. Hesketh categorically asserted that the June 2nd telex was a rejection of the concept that notice could only be given after expiration of the initial term. However, Mr. Hesketh admitted on cross-examination that he never specifically advised Cibro that Sohio rejected the proposal that notice could not be given until after the initial term.[39]

The court believes that the negotiations herein described clearly indicate that Sohio acquiesced to Cibro's continual demands that notice of cancellation only be effective after the expiration of the initial term. Mr. Hesketh, who was primarily responsible for the Cibro-Sohio negotiations, knew early on precisely what Cibro was seeking: a minimum contract of 18 months. Upon receipt of the May 4, 1978 telex, Mr. Hesketh was well aware that this "clever" language was an attempt to assure that notice could not be given until after expiration of the initial 12-month term. The exchange of telexes establishes that Sohio accepted Cibro's proposal. The June 2, 1978 proposal was clearly a compromise, i.e., instead of accepting Cibro's proposed two-year contract, it modified its initial proposal of 90 days to six months. Moreover, as noted previously, the June 2nd telex speaks specifically to

---

**38.** Mr. Bohlmann also testified that Mr. Hesketh, during a telephone conversation, agreed to "split the difference ... between what [was] originally offered ..., which was a 15-month contract," and a two-year contract. The court has given no weight to this testimony because (1) Mr. Bohlmann was unable to specify precisely when the conversation took place; and (2) his earlier deposition testimony suggests that his recollection of the conversation may be faded. However, the court does not find any inconsist-

ency between the trial testimony and the earlier deposition testimony because it is unclear whether the conversation took place before, or after, receipt of the June 2, 1978 telex.

**39.** The court has rejected defendant's assertion that Mr. Bohlmann's memorandum of August 14, 1978 indicates that Cibro knew that the contract would only extend one year.

notice of cancellation *after the initial year.* It is also critical to note that the final draft of the Cibro-Sohio contract is quite similar in phraseology to the language used in Mr. Bohlmann's May 4th telex. Both the telex and the final contract state that the contract shall be for a period of one year and will continue *thereafter* "subject to" or "unless terminated" by written notice of cancellation.[40]

Sohio was on notice that Cibro wanted an 18-month contract; had Sohio wanted to reject that proposal it would have dramatically modified the language ultimately used. Although Cibro had every reason to believe that Sohio was dubious about providing a long-term contract (by virtue of changes in East Coast trading patterns), it appears that Sohio's resistance deteriorated during the latter period of negotiations. Had Sohio ultimately intended that the contract exist for one year with no possibility of continuation, it should have unequivocally specified that in paragraph 7. Rejection of Cibro's proposal is simply not evident in the June 2nd telex or the final contract.

### C. *Sohio's Other Contracts*

This court's interpretation of paragraph 7 of the Cibro-Sohio contract is further supported by a review of Sohio's other contracts for the sale of crude oil. *See* Plaintiff's Exhibit Nos. 27B, 27G, 27J, 27M, 27P and 41.[41] Initially, however, the court is constrained to address Sohio's various challenges to the admissibility of this evidence. Sohio has taken the position that these contracts are inadmissible under U.C.C. § 2–202 and Rule 406 of the Federal Rules of Evidence. The court disagrees.

Notwithstanding defendant's protestations to the contrary, these contracts are admissible to aid the court in interpreting the term clause at issue in this litigation.[42] Judge Weinstein has noted that a party's business transactions with third parties is relevant to prove the meaning of a contract in appropriate cases:

> [t]here are strong arguments in favor of the rejection of proof concerning third party contracts where similarities are weak and comparisons strained, but there is no excuse for absolute exclusion of evidence that outlines a clear course of dealing or habit of doing business. Subsidiary evidence of parallelism must be strong and convincing when dealing with third party situations, and there is every reason to believe that standards of admissibility should be higher than when dealing with transactions between the same parties.

2 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 406[03] at 406–18 (1982) (quoting Slough, "Relevancy Unraveled," 6 Kan. L.Rev. 38–41 (1957).) *See also McCormick on Evidence* § 198 (2d ed. 1972) (contracts of a party with third persons may show customary practice and course of dealing and be highly probative on the terms of the present agreement). Numerous federal courts are in agreement. *See, e.g., Federal Express Corp. v. Pan American World Airways*, 623 F.2d 1297 (8th Cir.1980); *Joseph v. Krull Wholesale Drug Co.*, 147 F.Supp. 250 (E.D.Pa.1956), *aff'd*, 245 F.2d 231 (3rd Cir.1957); *see also Amerine National Corporation v. Denver Feed Co.*, 493 F.2d 1275 (10th Cir.1974).

Several of Sohio's contracts with other customers introduced into evidence clearly show that Sohio historically included the phrase "notice may be given at any time." Indeed, as plaintiff has pointed out with great vigor, one such contract is dated the same day that Mr. Hesketh drafted the

---

**40.** The final draft of the contract was delivered to Cibro in July of 1978.

**41.** Plaintiff's Exhibit No. 41 is a summarization by Cibro's expert, Peter Johnson, of all of Sohio's available 1978 and 1979 Gulf Coast, Caribbean and East Coast contracts contained within Plaintiff's Exhibit No. 27.

**42.** The court has reluctantly rejected Sohio's rather innovative argument that Cibro's proof with respect to Sohio's other customer contracts fails to establish trade usage or course of dealing under § 2–202. Moreover, the court finds that these contracts are admissible to aid in interpreting paragraph 7 of the contract, irrespective of trade usage or course of performance analysis.

Cibro-Sohio contract. *See* Plaintiff's Exhibit Nos. 27L and 55. Some of these contracts specifically provide that notice may be given *at any time during* the agreement. Under these contracts notice was to be effective during the initial term of the agreement. *See, e.g.,* Plaintiff's Exhibit No. 27L. Although several of these contracts were drafted after the Cibro-Sohio contract, they nevertheless show that Sohio continued to use the "limitation" [43] concept with other oil companies when it proved advantageous to do so. Thus, given Sohio's unquestioned notice that Cibro sought a minimum 18-month contract, and given the fact that Sohio had specifically rejected that concept in other contracts, the clear inference remains that, if the concept was disagreeable to Sohio, it certainly would have included a limitation provision in the present contract. The absence of such a clause strongly suggests that Sohio understood that Cibro's proposal included the concept that notice could not be given until completion of the initial term.

Based upon the evidence herein examined, the court concludes that, under paragraph 7 of the Cibro-Sohio contract, notice of termination could not have effectively been given until August 31, 1979. Sohio's notice of termination, which formally issued on January 23, 1979, was, therefore, ineffective during the initial term of the contract. Under the court's reading of paragraph 7, Sohio was contractually obligated to supply Cibro with crude oil through February of 1980, and, accordingly, Cibro is entitled to judgment on its contract claim.

## VI

### A. *Relevant Damage Period*

■ Cibro seeks damages based upon the profits it would have made either by refining and/or reselling the 15,000 barrels

per day of crude oil during each month it was entitled to purchase ANS crude oil from Sohio. The total damage period consists of eight months. As noted above, under its contract cause of action, Cibro is entitled to damages from September 1, 1979, the date Sohio impermissibly discontinued supplying Cibro with crude oil, through February 29, 1980, the date termination became effective. Under its regulatory cause of action Cibro seeks damages from September 1, 1979 through April, 1980. As with the contract cause of action, Cibro seeks damages during this eight-month period for lost profits on the 15,000 barrels per day of crude oil it was entitled to receive from Sohio. However, as noted earlier in the text of this opinion, Cibro is not entitled to cumulative damages on both causes of action. Thus, to the extent that Cibro has prevailed on its regulatory cause of action, the six-month damage period ascribed to the contract cause of action is subsumed within this eight-month damage period.

It should also be noted at the outset that, although Cibro is technically entitled to damages under its regulatory cause of action for lost profits through January, 1981, the date that controls on the allocation of crude oil were abolished, Cibro chose to limit its proof at trial to damages through April of 1980. Cibro apparently elected to limit the damage period because on May 1, 1980 the "entitlement" status of ANS crude oil changed.[44] Prior to this change ANS crude oil did not incur an entitlement obligation when it was delivered to the purchaser. After the status of ANS changed Cibro would have incurred a substantial obligation which would have forced it to discontinue the contract. Cibro admitted at trial that it would either have unilaterally terminated the contract or accepted Sohio's notice of termination effective April 30, 1980.[45]

---

**43.** By "limitation" the court means phraseology which potentially restricts the contract to the time period stated in the initial term.

**44.** This change was not published in the Federal Register until July 31, 1980. *See* 45 Fed.Reg. 50,855.

**45.** Peter A. Johnson, Cibro's expert on accounting and DOE regulations, testified that after the

B. *Damages Under the Regulatory and Contract Claims*

The court notes initially that the permutations with respect to damages in this case are particularly complex. As the following discussion makes clear, the ultimate damage award rendered will necessarily be based upon a certain amount of "clairvoyance" on the part of the court. This is so because the court is forced to make certain critical factual determinations with respect to precisely what Cibro would have done between September of 1979 and May of 1980. These factual determinations are directly related to the size of the ultimate damage award. For example, if the court finds that Cibro would have refined all of the crude oil it was entitled to receive from Sohio, damages will range from $14.6 million to $23.0 million, depending upon certain variable determinations and calculations. Alternatively, if the court determines that Cibro would have resold a portion of the crude oil, damages will range between $5.0 and $6.0 million, depending upon a further factual determination with respect to what percentage of crude Cibro would have refined. In addition to the above, the amount of damages will be radically affected by certain legal determinations this court might make. For example, if the court concludes that resale profits were not limited under applicable federal regulations to $.20 per barrel as Sohio contends, Cibro's damages will approach $36.0 million dollars.

1. *Cibro's Contentions and Calculations*

Cibro's damage calculations are based exclusively upon the profits it would have received by refining the 15,000 barrels per day of ANS crude during each month it was entitled to purchase the crude oil from Sohio. Cibro's total costs were determined by reference to (1) the cost of ANS crude

oil, (2) the incremental variable costs associated with refining and selling the ANS crude oil, and (3) the cost equalization programs under DOE regulations. Total revenues were determined by calculating the number of barrels of each product Cibro would have obtained from refining the crude and multiplying these yields by Cibro's monthly weighted average selling price for each product during the damage period. Costs were then subtracted from revenues to determine the total profits Cibro would have obtained if it received the crude through the damage period. Cibro claims total lost profits of $20,823,990.[46]

Cibro's actual damage calculations were performed by Peter A. Johnson, who testified specifically as to how Cibro's damages were calculated. Monthly flow charts summarizing the calculations for each month were prepared and introduced into evidence. *See* Plaintiff's Exhibit No. 42. Mr. Johnson also provided a detailed description of how costs and revenues were calculated during the first month of the damage period, and this methodology is identical for all subsequent months. The assumptions and data used by Mr. Johnson were based upon the testimony of prior witnesses and upon Cibro's business records. The cost of crude oil delivered to Cibro's refinery in Albany, New York was determined from Sohio's answers to Cibro's interrogatories. *See* Plaintiff's Exhibit No. 28. The crude oil costs were adjusted by the amount of entitlement benefits and benefits under the small refiner bias program which Cibro would have received.[47] There is no dispute between Cibro and Sohio as to the cost of the crude oil, and the parties disagree only slightly on the amount of entitlement and small refiner bias benefits that Cibro would have received.

Cibro determined its incremental costs by categorizing as fixed or variable the expense items which appear on its monthly financial statements. *See* Plaintiff's Exhib-

---

period of April 30, 1980, it would not have been profitable for Cibro to refine the ANS crude oil.

**46.** Additionally, based upon Sohio's "corrected" assumptions, Cibro claims damages in the amount of $23.0 million.

**47.** These benefits were published monthly in the *Federal Register.*

it Nos. 21, 22 and 23. Cibro's variable costs include expenses it would incur in delivering refined products to its customers. Sohio has accepted for the most part the variable costs as stated by Cibro, but has computed selling prices based upon a "refinery price," rather than a "delivered price."

Cibro calculated the amount of revenues it would receive from each barrel of ANS crude based upon product yields hypothetically calculated from product specifications and crude oil assays. The actual yield projections used by Cibro in the damage calculation are 51.6% residual fuel oil, 15.7% naphtha, and 33.6% No. 2 fuel oil.[48] Selling prices were determined by reference to the actual delivered prices received by Cibro for the products it sold during the damage period. Prices were calculated on a weighted average basis for each month from Cibro's Sales Register and Special Billings Journal. See Plaintiff's Exhibit Nos. 19 and 20; see also Plaintiff's Exhibit No. 38. The weighted average selling price for each product was multiplied by the number of barrels of each product which would have been obtained from the ANS crude oil to determine total revenues. The average per barrel profit claimed by Cibro on the Sohio ANS crude oil is $5.71 per barrel. Total costs were deducted from total revenues to arrive at a damage figure of $20,823,990 for the eight-month damage period.[49]

### 2. Sohio's Contentions and Calculations

Sohio claims that Cibro's lost profit calculation methodology is improperly based upon Cibro's erroneous contention that it would have refined all of the ANS crude oil. Sohio contends that, based upon Cibro's historical practices during the operation of the Cibro-Sohio contract, it is evident that Cibro would have resold a substantial amount of the ANS crude to maximize profits. Moreover, Sohio claims that physical and market factors during the damage period would have encouraged Cibro to resell as opposed to refine. Additionally, Sohio claims that Cibro's refinery capacity was insufficient to refine all the ANS crude oil with other crude that Cibro was receiving on a regular basis during the damage period. Sohio also claims that the Albany refinery had insufficient storage capacity to allow Cibro to stockpile the crude it was unable to refine. Finally, Sohio contends that, despite a proposed DOE Rule which would have limited resale profits to an absolute maximum of $.25 per barrel,[50] and despite existing regulations which allegedly limited resales to $.20 per barrel, Cibro nevertheless would have resold a substantial portion of the ANS crude.

Thus, central to Sohio's calculation of damages is its assumption that Cibro would have made resales of a large portion of the ANS crude oil. Sohio has taken the position that under existing DOE regulations, Cibro was limited to a maximum per barrel profit of $.20 on such resales. See 10 C.F.R. § 212.183(c).[51] Sohio contends that Cibro was never able to establish that its prices were consistent with either the permissible average mark-up established by "nearest comparable reseller" provision under which Cibro claimed to be operating. See Notice of Proposed Rulemaking, 44 Fed.Reg. 62,-848 (Oct. 31, 1979). The Federal Register notice stated that DOE would apply the rule retroactively.

---

**48.** A fuel oil consumption of 1% for running the plant was also factored into the calculations.

**49.** Cibro's claimed average per barrel profit is $5.71 per barrel. This amount assumes that Sohio was obligated to deliver 3,645,000 barrels of ANS crude to Cibro during the period September, 1979 through April, 1980.

**50.** On October 25, 1979, the DOE issued a Notice of Proposed Rulemaking in which it proposed a number of alternatives to its crude oil reselling price regulations. One of the alternatives was a flat $.25 per barrel mark-up limitation, which would have eliminated the "safe harbor" or

**51.** The regulation which addresses the pricing of crude oil by resellers is codified at 10 C.F.R. § 212.183. During the relevant damage period, the regulation provided that new resellers were to determine their prices based upon the prices at which crude oil was priced in transactions of the nearest comparable reseller in that month.

DOE or the mark-up for crude oil of the same tier and grade charged by the nearest comparable reseller. *Id.* Under applicable federal regulations, therefore, Sohio contends that any damages awarded in this case are limited to a $.20 per barrel profit, in addition to lost profits from refining. Additionally, Sohio maintains that the court should determine the number of barrels of crude Cibro would have refined not based upon the ultimate refining capabilities of the Albany plant, but based upon either the *actual* average refining runs during the damage period, claimed to be 13,764 barrels per day, or its historic refinery run average, alleged to be 18,948 barrels per day.

Sohio has calculated Cibro's damages at $5,300,000 if the court finds that Cibro would not have exceeded its historical 18.9 thousand barrels per day refining average during the eight-month period, with resales credited at $.20 per barrel less ANS royalty take-out.[52] Sohio has calculated damages at $5,000,000 if the court finds that Cibro would have refined ANS crude only at the historical percentage of 37%. Finally, in the event that the court determines that Cibro would have refined all available ANS crude, Sohio claims that Cibro's damage figure of $20,823,990.00 is incorrect and that the correct figure is $14,600,000. Sohio has also attacked a number of Cibro's damage assumptions. Sohio challenges (1) the number of barrels Cibro would have refined; (2) Cibro's profitability figures on refining the ANS crude; (3) Cibro's assumptions on product yields, product prices, and the amount of entitlement benefits Cibro would have received had it taken its final delivery of ANS in April or May of 1980; (4) Cibro's average refinery run figures; and (5) Cibro's figures with respect to transportation and working capital interest costs.

## C. *Cibro's Damage Period Behavior*

■ In the instant case the court is forced to act like an Oracle at Delphi in divining precisely what Cibro would have done with the ANS crude during the relevant damage period. Sohio has taken the position that Cibro would not have refined any more barrels of crude oil during the damage period than the average monthly number of barrels it refined during the ten-month period preceding that period. Cibro claims that Sohio's theory is misplaced because it ignores an announced change in DOE regulations in October, 1979, which, according to Sohio's own expert, would have rendered it inadvisable for Cibro to make any resales during the damage period. Additionally, Cibro claims that its operational and labor difficulties were fully ameliorated during the damage period, and, accordingly, it could have refined in excess of 30,000 barrels per day. Moreover, Cibro argues that, assuming *arguendo* the Albany refinery had insufficient capacity to process 30,000 barrels of crude oil per day, it nonetheless had sufficient capacity to store the crude and refine the product in subsequent months. In making these ultimate factual determinations the court will treat the parties' competing theories and assumptions seriatim.

### 1. *Operational and Labor Difficulties*

Cibro claimed at trial that it would have refined all of the ANS crude it was entitled to receive from September 1, 1979 through April 30, 1980 because the operational difficulties which occurred in 1978–1979 were eradicated prior to the damage period. Cibro claims that the major reason it historically resold crude was because the refinery could not process a full 30,000 barrels per day while these difficulties were occurring. Most of the testimony concerning Cibro's early labor and operational problems came from Mr. Cirillo. Mr. Cirillo testified that throughout the 11-month period of the Cibro-Sohio contract, the refinery experienced significant mechanical and operational problems. These problems included me-

---

**52.** The maximum number of barrels that Cibro has claimed, 15,000 barrels per day, should be reduced in the damage calculations. Cibro has stipulated that it would not have received the full 15,000 during the months of January 1980 through April 1980 due to an "Alaskan royalty" reduction in volume or "take out" of 2.5% of volume. *See* Plaintiff's Exhibit No. 3, ¶ 3.

chanical failures; weather difficulties, a labor strike at the Cibro refinery, a barge and tug strike, a plant turnaround in May, 1979, and cash flow problems in August, 1979.

Mr. Cirillo testified that following the commencement of refinery operations in the fall of 1978, the refinery began to experience some "fantastic" problems. He noted initially that it is known throughout the petroleum industry that a refinery will always have substantial startup difficulties. According to Mr. Cirillo, these difficulties can last from six months to two years. Mr. Cirillo testified that, during the first few months of Cibro's existence, the refinery experienced severe mechanical problems with its preheaters. This in turn made it extremely difficult to properly process and heat refinery oil. During this period Cibro was also faced with the task of training new refinery personnel. Mr. Cirillo further testified that the refinery experienced major problems due to bad weather; the bad weather forced management to periodically shut down the refinery which created a substantial "lag time" in further startups. The refinery also "froze" at one point during the winter.

There was also testimony indicating that a labor strike occurred at the refinery in February, 1979, as well as a barge and tug strike on the Hudson River from April through June, 1979. Mr. Cirillo testified that these events initially caused Sohio to refuse to send its ships up the Hudson River to the Albany refinery. Sohio apparently conditioned delivery of crude oil to Albany upon Cibro's assurance that non-union tugs would assist its vessels and that Cibro would agree to pay a "dead freight" charge of $1.25 per barrel. *See* Plaintiff's Exhibit Nos. 33, 34 and 35. Mr. Cirillo testified that the barge and tug strike in May, 1979 forced Cibro to shut down the refinery for the repair and "debottlenecking" of those items which were preventing the plant from running at maximum capaci-

ty.[53] Mr. Cirillo further testified that following a brief "turnaround" the refinery was capable of operating at a substantially increased capacity. The barge and tug strike continued, however, and Cibro met Sohio's conditions by providing non-union tugs and paying incidental dead freight charges.

During cross-examination Mr. Fred Candreva, Cibro's ship scheduling coordinator during the strike period, admitted that Cibro had some non-union tug assistance. He suggested that Mr. Cirillo had painted an overly severe picture of the refinery's difficulties during this period. He admitted that Cibro was able to bring crude to Albany during the strike; Mr. Candreva specifically identified the "Cove Sailor" and the "Overseas Valdez" as two vessels bringing ANS crude to Albany during the strike. Mr. Candreva also admitted on cross-examination that foreign crude oil arrived in Albany at the rate of 15–20 thousand barrels per day.[54] Mr. Candreva vaguely recalled at least seven different ships that made deliveries to Cibro during the strike period.

Sohio contends that Mr. Candreva's testimony indicates that the strike did not prevent ANS deliveries to Cibro and that Cibro's claim that it was forced to resell as opposed to refine the crude for reasons relating thereto are, therefore, disingenuous. The court agrees with Sohio that Cibro has overstated the significance of the pre-damage operational and labor difficulties at the Albany refinery. It appears from the testimony adduced at trial that these problems were not the sole motivating factor in Cibro's decision to resell as opposed to refine. It simply cannot be disputed that Cibro was partially motivated by attractive resale profits. For example, at certain points during the relevant period, Cibro made a profit of approximately $2.00 to $4.00 per barrel on refined oil as compared to a resale profit margin of $7.00 to $8.00 per barrel. However, even Sohio concedes that Cibro was curtailed to some

---

**53.** Cibro's refinery records indicate an actual downtime in May of 10 days. *See* Defendant's Exhibit W.

**54.** The foreign oil was from Venezuela.

extent on refinery capabilities by virtue of these intermittent difficulties. Thus, although the court rejects Cibro's claim that startup and operational problems caused it to resell, it does accept, for purposes of calculating damages, Cibro's proof that its average refinery runs during this period were affected by these problems.

The testimony simply does not support Cibro's claim that it necessarily would have refined all the ANS crude during the damage period because the only reason it made historical resales was due to refinery problems. The obverse, however, is true as well; that is, the testimony also fails to support Sohio's claim that Cibro necessarily would have made some resales during the damage period because the refinery could not operate at a 30,000 barrel per day capacity. Thus, the testimony with respect to Cibro's labor difficulties is inconclusive on the question of what Cibro's operational capacity was under normal circumstances. To make such a determination the court must look to the expert testimony relating *exclusively* to Cibro's maximum and extended refinery capabilities during normal operation.

### 2. *Refinery Capacity*

Mr. Cirillo testified that, by the commencement of the damage period in September, 1979, the refinery was fully operational and running smoothly. He further testified that it was Cibro's intention to refine all available crude oil during this period. Because there was no longer any operational and/or labor problems the refinery could, according to Mr. Cirillo, operate at a daily capacity of at least 30,000 barrels. All of Cibro's experts confirmed Mr. Cirillo's predictions with respect to continual production. Cibro's plant manager during the relevant period, Joseph Plunkett, testified that in actuality the refinery was capable of perennial operation at crude oil charge rates of between 30 to 40 thousand barrels a day without undue difficulty. This opinion was confirmed by Mr. Turner who testified that, based upon a review of the refinery's engineering designs augmented by the plant's updated hardware (including test data collected in June, 1979 on behalf of the DOE), the plant could run at a nominal capacity of approximately 40,000 barrels per stream day. He further indicated that on an extended basis the refinery could run at approximately 93% of nominal capacity, or 35 to 36 thousand barrels per day. *See* Plaintiff's Exhibit Nos. 23a and 24.

Sohio apparently concedes that Cibro's Albany refinery has a maximum per day capacity in excess of 30,000 barrels per day. However, Sohio contends that Cibro would not have been able to sustain that production on a long-term basis due to limited storage facilities at the Albany plant. Sohio's expert in refinery economics, Frank Culberson, testified that refineries typically have a storage capacity of approximately three times the largest ship which unloads at the refinery and that Cibro's projected 30,000 barrels per day sustained production would be difficult due to the refinery's limited (480,000 barrels) storage capacity. In Mr. Culberson's opinion, in view of Cibro's limited storage capacity, output would have been limited to the low 20,000 barrels per day range. Mr. Culberson's testimony supported the earlier testimony of Mr. William Blackledge, who stated that a refinery that receives its oil by tanker and not by pipeline should be able to store at least twice the volume carried by the largest tanker that comes to the refinery dock.

However, Sohio's evidence is insufficient to rebut the overwhelming evidence offered by Cibro in support of its contention that the Albany plant could have refined 30,000 barrels per day during the entire damage period. Even acknowledging the validity of Sohio's capacity/storage ratio analysis, Cibro simply could have, for example, refused to accept excess crude oil incapable of offloading and rescheduled a date for delivery. Although this would have been quite costly, Cibro could have taken steps to avoid this procedure. Alternatively, as Cibro's current plant manager, Don Sanders, testified, in the event that crude oil storage ever became a problem, Cibro could have used one of its company-

owned barges to handle any excess crude oil that could not be stored at the refinery. More importantly, however, Cibro has shown that it usually received its crude oil supplies in substantially smaller quantities than Sohio's calculations assume. *See* Plaintiff's Exhibit No. 61.

Notwithstanding the above, all of plaintiff's witnesses testified that Cibro's hypothetical crude oil runs of 30,000 barrels per day would not have been affected by the refinery's storage capacity. On the other hand, none of Sohio's witnesses spoke in unequivocal terms, but rather speculated that Cibro might have had difficulty in maintaining the 30,000 barrel per day output on a sustained basis. Although there was some testimony indicating that Cibro would have been forced to operate on a tight schedule in terms of coordinating ANS crude oil deliveries, Sohio simply failed to show that Cibro could not have met these exigencies, given what was at stake to Cibro. Moreover, and critical to a determination of this issue, Sohio has failed to acknowledge that, if Cibro had made a decision in September of 1979 to refine all its crude oil supplies, it clearly would have taken all necessary steps to insure that a sustained 30,000 barrel per day output could be maintained. Sohio's analysis presupposes that Cibro would have taken no affirmative action to modify or augment the Albany facility to increase its sustained average monthly production capacity. Thus, the fact that the refinery was designed for normal refinery runs of approximately 25,000 barrels per day before a second crude oil pump was required, is simply not relevant if one assumes that Cibro would have made a decision to refine at 30,000 barrels per day on a sustained basis.

For all of these reasons the court finds that plaintiff properly proved at trial that the Albany refinery was capable of processing all 30,000 barrels of crude oil per day on a sustained basis throughout the relevant damage period.

### 3. *The Regulations*

During the period Cibro resold ANS crude oil the resale profit margin it was entitled to receive was controlled by the price regulation applicable to resellers who never resold crude prior to December 1, 1977. *See* 10 C.F.R. § 212.183(c). Under this regulation Cibro's margin was limited to either the permissible average mark-up ultimately established by DOE or the markup for crude oil of the same tier and grade charged by the "nearest comparable reseller." The regulation read as follows:

If, in any month prior to the establishment by ERA of a permissible average markup applicable to a reseller which did not sell crude oil prior to December 1, 1977, such reseller's average markup exceeds its permissible average markup, the reseller shall nevertheless be deemed to [be in compliance with the price regulations] if the prices charged by the reseller for each grade of lower tier, upper tier, and stripper well and other exempt crude oil did not exceed the prices at which such crude oil was priced in transactions of the nearest comparable reseller in a month.

*Id.* *See also* 42 Fed.Reg. 64,856.

Sohio has taken the position that Cibro's damages are limited to $.20 per barrel on any resales it might have made during the relevant damage period because Cibro failed to establish at trial the margin of the nearest comparable reseller of ANS crude. Additionally, Sohio argues that even though Cibro knew its interpretation of this regulation was dubious,[55] it nevertheless would have resold the crude oil during the relevant damage period. Cibro, however, has taken the position that, based upon a proposed change in DOE reseller regulations, it would have made no resales during

---

**55.** In support of its claim that Cibro knew it was limited to a $.20 per barrel profit on resales, Sohio makes the following observations. First, Sohio notes that Cibro completed its monthly resale schedules filed with DOE by identifying the nearest comparable reseller as "undetermined." *See* Defendant's Exhibit F. Second, Sohio notes that counsel for Cibro filed a request for interpretation of the reseller price rule with DOE in July of 1979.

the damage period. Thus, Cibro argues that even assuming its interpretation of § 212.183(c) was historically incorrect, the proposed rule contemplated by DOE would have necessitated immediate cessation of all crude oil resales.

On October 25, 1979 the DOE issued a Notice of Proposed Rulemaking in which it proposed a number of radical alternatives to the existing crude oil reselling price regulations. *See* Notice of Proposed Rulemaking, 44 Fed.Reg. 62,848 (October 31, 1979). One of the alternatives proposed was a flat $.25 per barrel mark-up limitation which would effectively eliminate the "safe harbor" or "nearest comparable reseller" provision under which Cibro had been operating. The *Federal Register* notice indicated that, if implemented, the rule would be applied retroactively. The DOE stated:

> We recognize that the primary proposal presented above represents a significant departure from the regulatory scheme.... Inasmuch as many resellers expressed support for the average mark-up concept for determining compliance, we are soliciting comments on an alternative to the primary proposal which would ... limit resellers to a fixed average markup of twenty-five cents per barrel.

*Id.* at 62,852.

Nine months later, on July 29, 1980, DOE announced the final rule applicable to new crude oil resellers. 45 Fed.Reg. 52,112 (August 5, 1980). The regulation established a permissible average mark-up of $.20 per barrel. Commencing September 1, 1980, new resellers were limited to a flat $.20 per barrel mark-up on all resales. For resales prior to September 1, 1980, the rule retained the provision whereby a crude oil reseller would be deemed to be in compliance with the regulations if its prices did not exceed those charged by the nearest comparable reseller in the month. The new regulation states:

> (c) *Resellers which did not sell crude oil before December 1, 1977.* If, in any month prior to the establishment by ERA of a permissible average markup [September, 1980] applicable to a reseller

which did not sell crude oil prior to December 1, 1977 such reseller's average markup exceeds 20 cents per barrel, the reseller shall nevertheless be deemed to have complied with [the price regulations] of this section, if the prices charged by the reseller for each grade of lower tier, upper tier, and stripper well and other exempt crude oil did not exceed the prices at which such crude oil was priced in transactions of the nearest comparable reseller in the month.

10 C.F.R. § 212.183; *See also* 45 Fed.Reg. 52,112 (August 5, 1980).

Sohio has made two arguments in support of its position that Cibro would not have abandoned all resales in response to the proposed rulemaking. Both arguments are without merit and are hereby rejected. Sohio initially argues that Cibro would not have ceased making resales because it would not have known about the $.20 per barrel limitation until August 5, 1980, when the regulation was finally amended. However, as plaintiff correctly points out, the fact that the regulation was not finally adopted until August, 1980 is completely irrelevant. The Notice of Proposed Rulemaking was *issued* on October 25, 1979, and, thus, Cibro would have reacted to the change, if at all, at that time. Moreover, the proposed rule was to be applied retroactively thereby mandating that resellers change their mode of operation prior to its implementation in order to avoid its application.

Sohio next argues that, based upon Cibro's historic flouting of existing pricing regulations, it would have failed to heed the clear import of the proposed rule. This argument simply ignores the purported basis upon which Cibro exceeded the $.20 cap under existing regulations and the distinct changes proposed in the October 25, 1979 notice. During the operation of the Cibro-Sohio contract, Cibro utilized the nearest comparable reseller provision to justify its margins on the resale of ANS crude. Under the existing regulation, there was a certain degree of uncertainty as to how that concept would apply to Cibro's resales,

particularly resales of ANS crude, and, thus, it attempted to capitalize or exploit this perceived ambiguity. However, the proposed change would have completely eliminated this provision thereby placing Cibro in the position of having to accept a flat margin of $.25 per barrel on ANS resales. Under the proposed regulatory change there was no longer an arguably pliable provision upon which Cibro could rely to justify its alleged excessive margins.

The court finds that upon the issuance of the Proposed Notice of Rulemaking, Cibro would have ceased making all resales as early as October 25, 1979. Cibro simply would have had no viable choice except to limit all future resales of crude; any other course of action had the potential of costing Cibro millions of dollars in lost profits. Even though refining profits would have been substantially less than Cibro's historic resale profits, Cibro would have accepted the relative decrease to insure a maximum profit potential. This conclusion is actually supported by the testimony of Sohio's own expert witness, Frank Culberson, who testified emphatically that, faced with a margin limitation on resales of $.25 per barrel, he would have advised Cibro to refine until May of 1980.

The court believes that the proposed rulemaking is simply more significant in assessing what Cibro would have done than Cibro's historic practices during the period of November, 1978 through August, 1979. Circumstances had radically changed, and the court concludes that Cibro would have been forced to refine all ANS crude from October, 1979 through April, 1980.[56] Additionally, based upon the testimony of Mr. Cirillo, the court finds that Cibro would have discontinued all resales prior to the commencement of the damage period. Although Cibro did make some resales in August, 1979, it refined all available crude oil in June and July, 1979, including all of its foreign oil. The court accepts Mr. Ciril-

lo's testimony that Cibro was forced to make resales in August due to cash flow problems. The court further accepts Mr. Cirillo's testimony that these problems were solved by the end of August and that it was Cibro's intent to refine all available crude oil commencing in September of 1979.

**D. *Variables Affecting Actual Damages***

Sohio has approximated Cibro's damages at $14.6 million based upon a future profitability methodology on ANS crude which challenges Cibro's assumptions and specifications on product yields. Sohio has also computed different figures with respect to product prices and the amount of entitlement credits for the sale of ANS crude. Sohio has also utilized different assumptions concerning product selling prices which have substantially reduced Sohio's estimate of Cibro's damages. Finally, Sohio has included a working capital charge which it claims should be factored into the ultimate damage award.

**1. *Product Yields***

Cibro had no historic data from which actual yields for ANS crude oil could be calculated because it never refined ANS exclusively during the operation of the Cibro-Sohio Contract. It was, therefore, necessary for Cibro to determine product yields based upon a review of product specifications and crude oil assays. Cibro's estimate with respect to these product yields came from the testimony of Mr. Plunkett and Mr. Turner who both gave their opinion that Cibro would obtain yields of approximately 51% on residual fuel oil, 15% naphtha, 33% No. 2 fuel oil, with the remaining 1% being consumed as fuel for the plant heaters. Mr. Plunkett testified that Cibro was able to obtain these yields because product specifications for naptha and No. 2 fuel oil permitted it to make comparatively more of these products than would be expected were more stringent specifica-

---

**56.** *See* Plaintiff's Exhibit No. 48. These industry articles suggest that the October rulemaking proposal had a substantial effect on crude oil

resellers and that some companies ceased all crude oil reselling activity.

tions required. Cibro's experts testified that yields are estimated on the basis of the "controlling specifications" of the refined product. According to Mr. Plunkett, the controlling specification for naptha is a maximum "cut point" of 400° and that higher naphtha cut point specifications translate into increased yields of product. Mr. Plunkett identified the controlling specification for No. 2 fuel as its sulphur content percentage which in his estimate approximates one-half of 1% (.5%). Higher fuel oil sulphur specifications in turn translate into increased yields of product.

Cibro asserts that Sohio's product yield estimates are based upon inaccurate product specification assumptions which incorrectly reduce the potential size of the damage award. Cibro's experts also claim that Sohio used the wrong assay for specific gravity of the ANS crude oil. Sohio's expert, Frank Culberson, testified that his damage calculations were based upon a maximum cut point on naphtha of 380° as opposed to Cibro's figure of 400°. In addition, Mr. Culberson calculated the sulphur specification for No. 2 fuel oil at .3% as opposed to Cibro's projection of .5%. *See* Plaintiff's Exhibit No. 67. Although Mr. Culberson initially testified that a 400° cut point for naphtha "is standard in the industry," he nevertheless used a lower specification for each by-product of the ANS crude.

Sohio has argued that Cibro's challenges to Mr. Culberson's end point specifications for naphtha are false and deceptive because they assume that naphtha was the preferred product run from the Albany refinery. For example, Sohio claims that, during the first four months of the damage period, Cibro's sale price for naphtha was lower than its price for distillate, and, therefore, Mr. Culberson's LP computer model is correct because it was designed to optimize No. 2 production against naphtha production. Moreover, Sohio claims that the 380° boiling point used by Mr. Culberson is safely in excess of most of Cibro's sales contract requirements for naphtha, estimated to be 362°, and that Cibro is not entitled to use a maximum 400° cutpoint

because that figure gives Cibro an unwarranted windfall on profits.

Additionally, with respect to Mr. Culberson's sulphur specifications for No. 2 fuel oil, Sohio has taken the position that Mr. Plunkett's estimate of .5% was limited to upstate New York sales and that sulphur content specifications for other markets range from .2% to .3%, thereby reducing Cibro's average yield projections. Cibro has taken the position that Mr. Plunkett's deposition testimony relied upon by Mr. Culberson in making his yield estimates confirms Cibro's .5% sulphur specification calculation.

Based upon a review of the expert testimony given in this case, the court accepts Cibro's specifications and projections on product yields. The actual yield projections used by Mr. Johnson comport with the evidence and are logically consistent with Cibro's stated refining objectives for the Albany plant. Moreover, although it is clear that Mr. Culberson's calculations have a basis in fact and are for the most part reasonable, they simply fail to controvert the plaintiff's proof regarding the accuracy of its yield specifications. Thus, for example, while Sohio makes a compelling argument that the 400° specification used by Cibro is a "maximum" figure not necessarily applicable to all of Cibro's contract requirements, there simply is no evidence to support Sohio's claim that 380° is a better figure simply because it is an "average" specification. Because all of Cibro's contracts were not offered into evidence at trial the court must assume that its projected 400° requirement is accurate. Additionally, it is clear from Mr. Plunkett's deposition testimony introduced at trial that Cibro did properly identify naphtha at a 400° cut point and No. 2 fuel oil at a .5% sulphur content.

Because Sohio has failed to controvert the validity of Cibro's yield specifications and assumptions, those projections will be accepted for determining Cibro's ultimate damage award in this case. However, by virtue of accepting Cibro's assumptions on

product yield potential, the court necessarily must reject Cibro's proposed "adjusted" figures relative to Sohio's assumptions and calculations.

### 2. *Entitlement Benefits*

Cibro's damage calculations assume that it would have received and refined all the crude oil it was entitled to receive from Sohio during the month in which it was entitled to purchase those barrels. No disagreement exists between Cibro and Sohio in computing damages for most of the monthly entitlement or cost equalization benefits hypothetically received by Cibro during the damage period. However, the parties do disagree on the entitlement status of crude oil received in April and/or May of 1980. Cibro's damage calculations further assume that its last shipment of ANS crude oil would have been received and refined by the end of April, 1980. Cibro has claimed total lost profits for that month in the amount of $2,014,081.00. This figure presupposes that Cibro was justified in deducting from its "costs" a DOE entitlements benefit of $2,470,899.00. This adjustment in Cibro's total costs results in a corresponding increase in its claimed lost profits. *See* Plaintiff's Exhibit No. 42. Sohio has taken the position that this "benefit" should be reduced from Cibro's award by virtue of a change in the DOE cost equalization program effective May 1, 1980. Sohio claims that, owing to historic delays and lags in deliveries at the Albany plant, Cibro would not have been able to accept the remaining one-half ANS delivery until the end of April or the early part of May, 1980. Alternatively, Sohio claims that all final ANS crude oil would have been received in May, 1980, thereby resulting in both a loss of the April entitlements benefit and the imposition of a May entitlements penalty calculated to be $419,490.00.

Cibro has proposed a modification of its calculation on entitlement benefits should the court accept either of Sohio's theories. Cibro claims that its per barrel entitlement would increase by $1.12 per barrel on any

crude oil refined in May of 1980 because the May entitlements value on crude was greater than the April value, $6.22 and $5.10, respectively. Alternatively, if the court finds that Cibro would have accepted the second half of ANS crude oil at the end of April, its entitlements benefit would incrementally increase by $1,364,512.00. This calculation is based upon taking the May entitlement value and multiplying it by the remaining one-half volume of 219,375 barrels. Ironically, should the court accept Sohio's assumptions, Cibro's damages increase substantially.

The court finds that Sohio's assumptions are based upon an incorrect interpretation of the entitlements program and are not supported by the facts adduced at trial. As plaintiff correctly points out in its post-trial brief, entitlements penalties are incurred based upon the number of barrels received while entitlement benefits are earned based upon the number of barrels refined. As a result thereof, assuming that Cibro received the ANS crude in April, 1980, but refined it in May, 1980, there would still have been an entitlements benefit and a reciprocal avoidance of any cost equalization penalty. *See* 45 Fed.Reg. 50,855. In an attempt to get around this result, Sohio now claims that Cibro would not have received the ANS crude until May. This assertion is contrary to Sohio's position at trial and is wholly inconsistent with the assumptions and testimony of its own experts. Mr. Culberson testified that Sohio's damage calculations were based upon the premise that Cibro would have received ANS crude deliveries by the 15th and 30th of each month. He assumed for purposes of calculating damages under the entitlements theory that Cibro would have received its last ANS delivery by April 30, 1980. Sohio, thus, mischaracterizes Mr. Culberson's testimony when it argues that he indicated that some ANS carryover would occur into May. Mr. Culberson was merely referring to inventory and not deliveries that might carryover into May. Indeed, Plaintiff's Exhibit No. 61 indicates that Cibro never received a shipment of crude oil after the end of the anticipated

month of delivery. The exhibit also reveals that on occasion Cibro actually received deliveries in months preceeding anticipated deliveries.

Notwithstanding the claim that Cibro would have refined ANS in May of 1980, the court finds that Sohio failed to refute Cibro's proof that it would have refined all ANS crude oil by the end of April, 1980. Cibro offered ample proof to suggest that on an historic basis it received crude on the 1st and 15th of each month as opposed to the timetable suggested by Sohio. Moreover, the court has already rejected Sohio's claim that the Albany refinery had insufficient storage capacity to accommodate regular ANS deliveries. Consequently, Sohio's argument that April deliveries would have been put off until May is similarly rejected. Sohio simply failed to establish that Cibro would have been forced to accept deliveries in May. Accordingly, the court finds that Cibro's deduction from "costs" of its April entitlements benefit is justifiable.[57]

### 3. Product Selling Prices

Cibro determined product prices for purposes of determining lost profits by calculating its weighted average selling price on a delivered basis in each month of the damage period. A delivered price was used as opposed to a refinery price because Cibro included all its transportation costs as variable costs. John Klopstock, Cibro's Regional Marketing Manager during the damage period, testified that projected selling prices for ANS crude were based upon the assumption that additional product could have been sold at the same prices that similar types of product were actually sold at during the damage period. Mr. Klopstock testified that Cibro based this assumption upon the belief that during the damage period the relevant market was quite strong. Sohio has challenged this assumption. Sohio claims that Cibro is only entitled to the lowest posted price on crude oil (as reflected in the industry's

*Platt's Oil Price Handbook*) because demand for its product had declined by over 11% during the damage period. Sohio has also taken the position that had Cibro made incremental sales on ANS crude during the damage period, the relevant market would have become flooded, thereby depressing overall product demand.

### (a) Residual Fuel Oil

Cibro established at trial that during the damage period it was forced to make replacement purchases of approximately 70 million gallons of residual fuel oil. The evidence adduced at trial revealed that Cibro made a mere $75,389.30 profit on those sales due to the exorbitant prices it was forced to pay in obtaining the replacement fuel. For purposes of calculating its lost profits on residual fuel, Cibro does not contend that it would have sold incremental barrels of ANS had Sohio made deliveries; rather, Cibro claims that it would not have been forced to make replacement purchases and that its damages should properly represent the amount of profit it would have realized had Sohio properly made deliveries.

Sohio's expert testified that Cibro's claimed replacement fuel profit was exceedingly low and that actual profits probably ranged between $690,000 to $1,380,000. These variable figures assume that Cibro should have earned between $.01 and $.02 per gallon on all sales. Sohio claims that this hypothetical profit excess should be deducted from Cibro's projected ANS lost profit on residual fuel oil. Sohio argues that because this profit was earned in place of refining profits it should be reduced from Cibro's ultimate award to prevent an unwarranted windfall.

Cibro's profit figures with respect to residual fuel oil are hereby accepted. In so ruling the court has categorically rejected Sohio's excess profit reduction theory. Sohio's theory is based upon the conjecture of Mr. Culberson that Cibro must have earned more than $75,389.30 in replacement fuel

---

**57.** As a result of this disposition, the court has rejected Sohio's argument that Cibro would have incurred cumulative entitlements penalties for succeeding months.

profits. Sohio has strongly implied that Cibro's profit figures on replacement purchases were deliberately manipulated to increase the ultimate damage award on ANS sales. However, during trial Sohio was unable to refute Cibro's documented profit figures, and the court is not prepared to speculate now on whether inventory figures were skewed to show artificially lower resale profits. The evidence introduced at trial taken on face value clearly supports Cibro's claim that it made a nominal profit on residual fuel oil in the amount specified. Accordingly, the court has accepted Cibro's figures on residual fuel lost profits on ANS deliveries, less Cibro's actual profit on replacement sales during the damage period, calculated at $75,389.30.

#### (b) No. 2 Fuel Oil

Cibro's proof with respect to incremental sales on No. 2 fuel oil was overwhelming. Mr. Klopstock testified that Cibro received daily inquiries for the purchase of distillate fuel oil which would have allowed Cibro to refine and sell all available ANS, given Cibro's small share of the Albany market. Moreover, Cibro established at trial that, had it encountered any difficulties with selling No. 2 to its normal customers, it could have sold any remaining crude in the New York Harbor at "spot prices" equal to or in excess of prices charged to its regular customers. Mr. Klopstock was quite emphatic in stating that during the damage period Cibro would have had no difficulty in receiving the same prices for incremental crude that it actually did receive during the relevant damage period. Cibro's figures on No. 2 fuel oil profits are, thus, accepted.

#### (c) Naphtha

Sohio has not challenged Cibro's assumptions with respect to naphtha prices and the court has found no reason why they should not be accepted.

#### 4. *Transportation Costs*

The court has accepted Cibro's methodology with respect to transportation costs and selling prices because Sohio's alternative methodology is simply no more reasonable. There is no question that Cibro may properly set ultimate selling prices based upon an actual delivered price to its customers. Although Sohio's *Platt's low* methodology is obviously a useful system for determining product prices, its use here is suggested merely to decrease Cibro's ultimate damage award.[58]

#### 5. *Cover*

Finally, Sohio argues somewhat flacidly that Cibro should not receive consequential damages because it failed to offer proof that it could not provide "cover" for the loss of the crude oil. U.C.C. § 2–715. Sohio asserts that Cibro failed to controvert its proof that, subsequent to being advised that the contract was being terminated, it rejected an opportunity to purchase crude oil from an alternate supplier. However, Mr. Cirillo's undisputed testimony revealed that he made a herculean effort to secure substitute sources of crude oil. He indicated that Cibro attempted to purchase crude oil from sources throughout the United States and abroad.

### VII

The court has calculated Cibro's total damage award by computing its total lost profits for each month it was entitled to receive ANS crude from Sohio, less the profit it realized on the sale of replacement residual crude, plus the damages it is entitled to receive on its price claim.

#### A. Refining Lost Profits

| Date 1979 | Cibro's Cost | Cibro's Income | Cibro Lost Profits |
| --- | --- | --- | --- |
| Sept. | $ 9,060,884 | $10,826,046 | $ 1,765,162 |
| Oct. | 8,835,778 | 10,554,347 | 1,718,569 |
| Nov. | 5,341,014 | 6,888,614 | 1,547,600 |
| Dec. | 13,166,394 | 17,572,403 | 4,406,009 |

**58.** Sohio's assumptions regarding working capital are similarly rejected.

A. Refining Lost Profits

| Date 1980 | Cibro's Cost | Cibro's Income | Cibro Lost Profits |
|---|---|---|---|
| Jan. | 9,685,155 | 13,650,004 | 3,964,849 |
| Feb. | 10,127,333 | 13,505,209 | 3,377,876 |
| March | 10,256,017 | 12,295,861 | 2,039,844 |
| April | 9,976,430 | 11,990,511 | 2,014,081 |
| TOTAL | $76,449,005 | $97,282,995 | $20,833,990 |

| | |
|---|---|
| Less profit on replacement fuel oil | 75,389.30 |
| Less 2.5% Royalty take-out from January 1, 1980–April 30, 1980 | 272,865.00 |
| SUBTOTAL | $20,485,735.70 |
| B. Price Claim Damages | 191,973.84 |
| C. Total Damage Award | $20,677,709.54 |

For all of the foregoing reasons judgment is hereby entered in favor of Cibro in the amount of $20,677,709.54.[59]

It is so Ordered.

**59.** Although plaintiff's amended complaint seeks prejudgment interest, the parties failed to address this aspect of the damage award either at trial or in their post-trial submissions. Accordingly, this figure excludes whatever interest, if any, is due and owing to plaintiff.